Mary Elizabeth DEAN et al., Plaintiffs,

v.

R. Robert GLADNEY et al., Defendants.

Civ. A. No. 75–G–140.

United States District Court,
S. D. Texas,
Galveston Division.

May 16, 1978.

---

W. Thomas McKissick, Alvin, Tex., Edward L. Sargologos, Houston, Tex., for plaintiffs.

Ogden Bass, Angleton, Tex., for defendants Gladney, Saldivar, Maddox, County of Brazoria and City of Freeport.

William J. Cornelius, Jr., McLeod, Alexander Powel & Apffel, Inc., Galveston, Tex., for defendant City of Angleton.

John S. McEldowney, Mills, Shirley, McMicken & Eckel, Galveston, Tex., for defendant City of Clute.

## MEMORANDUM OPINION

COWAN, District Judge.

*Factual Background*

On May 11, 1975, 30 to 40 persons who had been enjoying Surfside Beach were arrested and later confined in the Brazoria County jail.

Six plaintiffs contend that they were arrested without probable cause and subjected to cruel and unusual punishment by the arresting officers.

The essential controverted fact issues have been resolved by a jury verdict. In addition, a number of facts, not specifically submitted to the jury for resolution, are established as a matter of law.

The weekend before May 11, 1975, an event occurred which created some apprehension at the Brazoria County Sheriff's Department. On that occasion, Officer Mike Jones, a witness but not a defendant, effected an arrest upon Surfside Beach. While he was driving from the beach, the rear door of his police vehicle was opened by persons on the beach and his prisoner

escaped. This event, in addition to other information coming to the Brazoria County Sheriff's Department, made Sheriff Gladney, one of the defendants herein, and his deputies apprehensive that additional trouble might be expected on May 11, 1975. For that reason, the patrol car normally patroling the beach was occupied by two deputies. In addition, Sheriff Gladney instructed his deputies, in connection with troubles which were contemplated on May 11, 1975, that "unlawful force would be met with lawful force."

During the afternoon hours, Deputy Sheriffs Roel Saldivar and Mike Jones, who were acting as partners, drove to the beach and observed two men either engaged in an altercation, or attempting to repair the physical damage resulting therefrom. Saldivar and Jones arrested the two individuals, handcuffed them and placed them in the rear of their police vehicle.

After effecting the first two arrests, Deputy Sheriffs Jones and Saldivar did not leave the beach immediately because, according to their testimony, a large number of swimmers began to crowd around their police vehicle, creating a situation in which the officers feared that if they placed their prisoners in the back seat and started to drive away, the swimmers would open the back door and allow the prisoners to escape. Therefore, Officers Jones and Saldivar radioed for assistance, which promptly arrived.

Just after the first assistance vehicle arrived at the scene, Brazoria County Deputy Sheriffs arrested George Hawkins, one of the plaintiffs herein. The jury found that Jones and Saldivar had probable cause for Hawkins' arrest. Hawkins was handcuffed, with his hands behind his back and placed in the rear seat of the Jones-Saldivar patrol car with the two other prisoners.

Shortly after Hawkins' arrest, the officers on the scene began the arrest of a large number of other people. Within a fairly short period of time, five other men had been arrested, handcuffed and placed along with Hawkins and the two original detainees in the rear of the Jones-Saldivar patrol car.

Within a very short period of time, somewhere between 15 and 20 police vehicles arrived at the scene, along with a "paddy wagon," a van-type vehicle into which prisoners could be placed. Despite the availability of other places to place the prisoners while the disturbance was controlled, Officers Jones and Saldivar left Hawkins and seven other handcuffed individuals in the rear of their police vehicle for approximately one and one-half hours with the windows closed. The temperature was hot. Applying the uncontroverted facts in the light of the jury verdict, the inference may be drawn that the officers at the scene jointly commenced a course of tortious conduct when these seven men were left jammed into the rear of the police vehicle while the "paddy wagon" and other vehicles were available at the scene.

Ultimately, the Jones-Saldivar patrol car was driven to the Brazoria County jail in Angleton, and Hawkins and seven other individuals were removed from the vehicle and taken into the Brazoria County jail. There is evidence that Hawkins was unable to walk after the confinement in the patrol car and that he was allowed to fall to the pavement while being removed from the patrol car.

Hawkins was ultimately booked, held during the evening hours until he made bond, and finally released. Hawkins was never prosecuted and charges against him were ultimately dismissed.

The jury found that Jones and Saldivar subjected Hawkins to cruel and unusual punishment, and that in doing so, they had not acted in good faith. The jury awarded Hawkins $3,300 in actual damages.

It is established without dispute that shortly after the initial assisting units arrived, Deputy Sheriff Dugan, one of Sheriff Gladney's principal assistants and the Deputy Sheriff in charge of the Sheriff's Department on the day in question, arrived at the beach, took charge of the activities of the various officers on the scene and established a "command post" for the purpose of directing activities.

Plaintiffs introduced evidence that after Hawkins' arrest, Officers Jones, Saldivar and other officers who had arrived to assist them, began indiscriminately arresting numerous citizens, and subjecting the arrestees to unreasonable force such as kicking and striking them with billy-clubs. There was a great dispute about exactly what occurred; but it is undisputed that during the early stages of the disturbance, a vehicle occupied by one of the plaintiffs, Mrs. Ronald Cowley, her husband Ronald Cowley, and Mrs. Cowley's younger sister, Laurie Walker, drove up to the scene of the disturbance. The car in front of the Cowley vehicle stalled, and Mr. Cowley got out of his car to assist the driver of the stalled car. The driver of the stalled vehicle was a relative of the Cowleys.

Mr. and Mrs. Cowley and Laurie Walker all testified that as they sat in the vehicle waiting for Mr. Cowley to assist the stalled vehicle ahead of them, Officer Saldivar (one of the defendants here) walked up to their car, clapping his hand with his billy-club. Laurie Walker and Mrs. Cowley were taking pictures of the alleged police brutality. Officer Saldivar leaned into the Cowley vehicle and told Mrs. Cowley and Laurie Walker that if they did not stop taking pictures, he would smash their camera into their heads.

As soon as Mr. Cowley had assisted his relative in starting the car, he pulled his vehicle to the fringes of the disturbance to a beach establishment called the "Sunshine Hut." He parked his car with the purpose of going to the Sunshine Hut to obtain hamburgers. While Mr. and Mrs. Cowley ascended the steps of the Sunshine Hut, Laurie Walker remained in the Cowley vehicle and continued to take pictures. Officer Leroy Maddox and one other unidentified officer came to Laurie Walker, took her camera from her, removed the film, threw the film on to the sand, and threw the camera in the back seat. Thereupon, the officers arrested Laurie Walker and started to escort her toward the police vehicle. Observing these events, Mrs. Cowley ran back to her younger sister, who was 16 years of age at the time, protested her sister's arrest by stating that the girl could

not be arrested for taking pictures. The officers in the immediate vicinity stated that they could arrest Ms. Walker for taking pictures, and in fact if Mrs. Cowley protested, she would be arrested also. She was arrested.

The identity of the officers who arrested Mrs. Cowley cannot be established, but it is clearly inferable that Officer Maddox participated fully in the events of culminating in Mrs. Cowley's arrest and the jury has so found. Officer Maddox was identified definitely as the officer who was arresting Laurie Walker. Officer Maddox was one of the officers to whom Mrs. Cowley protested. The jury found, on the basis of adequate evidence, that Mrs. Cowley was arrested in retaliation for her action and that of her sister in taking pictures.

Mrs. Cowley and Laurie Walker were placed into the rear of the police vehicle operated by Officer Maddox and were left there for approximately one to one and a half hours before they, too, were taken to the Brazoria County jail. Officer Maddox' patrol car ultimately came to be occupied by at least two other women who were apprehended in the manner described below.

During this series of events, another plaintiff, Mrs. Frank (Sharon) Polk, was arrested because she was protesting her husband's arrest. The jury has found that the law enforcement officers who arrested her did not lack probable cause, but that she was subjected to cruel and unusual punishment by the arresting officers.

The jury found that one other female plaintiff, Mary Elizabeth Dean, was subjected to cruel and unusual punishment and that she had been arrested in retaliation for the exercise of her First Amendment rights.

The findings of cruel and unusual punishment with reference to the three women plaintiffs, i. e., Mrs. Frank Polk, Mary Elizabeth Dean, and Mrs. Ronald Cowley, are predicated on the undisputed facts described below.

All four of the women who had been apprehended were placed in the back of the

Maddox vehicle, and remained there for approximately one and one-half hours while the officers controlled the disturbance. During this period of time, Mrs. Polk was highly distraught because she was fearful that her five-months old child had been left unattended on the beach. There was no ventilation in the hot police vehicle.

Ultimately, Officer Maddox got into the vehicle and drove it to the Brazoria County jail at excessive rates of speed, approximating 80 miles per hour. Although begged to slow down by the women prisoners, who testified that they were terrified, he refused to do so.

When the Maddox vehicle arrived at the Brazoria County jail, the four women were taken into the jail and placed into a small cell with approximately 20 male prisoners. Sheriff Gladney has testified forthrightly that it is "unthinkable" to place female prisoners with male prisoners.

At the time these four women were placed in a cell with 20 male prisoners, a number of the male prisoners were laying on the floor groaning because of their injuries. Some were urinating on the wall. The women requested permission to go to the bathroom and were told by the jailors, who were Brazoria County Deputy Sheriffs, that they could go ahead and urinate with the men.

After a period of time, the four women were removed from the cell in which they had initially been placed, and put in a janitor's closet, again with no bathroom facilities. Ultimately they were searched by a police matron who told them that they had a choice of paying the $27.50 fine or pleading not guilty and posting a bond of $300.00.

*Mary Elizabeth Dean*

Mary Elizabeth Dean was a passenger in a vehicle with two other persons. During the disturbance she was waiting upon a ramp leading up the fishing pier while her two friends were inside obtaining a hamburger. She was observing the activities of the officers, was upset and was crying. She was approached by an unidentified officer who told her that she would be required to leave the beach. She told the officer that she was with two other people who were inside, that she was not driving and that she could not leave until her two friends returned. The officer turned around and started to leave, at which time, Ms. Dean, with her left hand, silently gave the officer a military salute. Apparently perceiving that this had been done, the unidentified officer turned around, arrested Ms. Dean and put her in the Maddox vehicle along with the other women prisoners. Ultimately, Ms. Dean was taken to the Brazoria County jail by Maddox and subjected to the same treatment as the other three women.

*Jury Findings*

The jury has made the following pertinent findings of fact:

1. The Brazoria County Deputy Sheriffs did not lack probable cause for arresting George Hawkins.

2. The Brazoria County Deputy Sheriffs did not use greater force than necessary in securing Hawkins' arrest and detention.

3. The Brazoria County Deputy Sheriffs did not delay for an unreasonable period of time before taking Hawkins before a magistrate.

4. The Brazoria County Deputy Sheriffs did subject Hawkins to cruel and unusual punishment.

5. The officers who participated in the illegal activities with reference to Hawkins were Brazoria County Deputy Sheriffs Roel Saldivar and Mike Jones.

6. The officers who participated in Hawkins' arrest and detention did not act in good faith.

7. $3,300 would reasonably compensate Hawkins for the pain, suffering and mental anguish directly and proximately resulting from the illegal action of defendants.

8. Deputies Saldivar and Jones did act with good faith in connection with the arrest of Hawkins, but not in connection with his detention.

9. The law enforcement officers who participated in Mrs. Frank (Sharon) Polk's arrest did not lack probable cause for her arrest.

10. The officers who arrested Sharon Polk did not use greater force than necessary to secure her arrest and detention.

11. The law enforcement officers who participated in Sharon Polk's arrest and detention did not delay for an unreasonable time before taking her before a magistrate.

12. The law enforcement officers who participated in Sharon Polk's arrest and detention did subject her to cruel and unusual punishment.

13. The law enforcement officers who actually arrested Sharon Polk or participated in the illegal actions with reference to her were not known.

14. The officers who participated in Sharon Polk's arrest and detention did not act in good faith.

15. The sum of $1,000 would fairly and reasonably compensate Sharon Polk for the pain, suffering and mental anguish directly and proximately resulting from her illegal arrest and detention.

16. Mary Elizabeth Dean was arrested in retaliation for exercising her protected First Amendment rights.

17. Mary Elizabeth Dean would not have been arrested if she had not exercised her protected First Amendment rights.

18. The officers who arrested Mary Elizabeth Dean did not lack probable cause for arresting her.

19. The officers who detained Mary Elizabeth Dean did subject her to cruel and unusual punishment.

20. The sum of $2,600 would fairly and reasonably compensate Mary Elizabeth Dean for the pain, suffering and mental anguish directly and proximately resulting from her arrest and detention.

21. The officers who participated in Mary Elizabeth Dean's arrest did act with malice, ill will and conscious disregard of her rights and that $1,000 should be awarded to her as punitive or exemplary damages.

22. Mrs. Ronald Cowley was arrested in retaliation for her action, or that of her younger sister, in taking photographs.

23. Mrs. Cowley would not have been arrested if she and her younger sister had not exercised their rights, as protected by the First Amendment, to take pictures.

24. The officers who arrested Mrs. Cowley did lack probable cause.

25. Mrs. Cowley was subjected to cruel and unusual punishment.

26. Patrolman Leroy Maddox did participate in the illegal activities with reference to Mrs. Cowley.

27. The sum of $4,000 would fairly and reasonably compensate Mrs. Cowley for the pain, suffering and mental anguish directly and proximately caused by her arrest and detention.

28. The officers who arrested Mrs. Cowley did act with malice, ill will and with conscious disregard of her rights.

29. The sum of $1,000 in exemplary or punitive damages should be awarded to Mrs. Cowley.

In addition to the facts established by the jury findings, the Court finds that a number of facts are established, as a matter of law, as follows:

1. Shortly after the initial arrests, one of Sheriff Gladney's most senior deputies, Deputy Paul Dugan (now deceased) arrived, assumed overall command of the activities at the scene, established a "command post" and thereafter exercised effective control over the various officers of various municipalities and agencies which came to the scene of this disturbance.

2. Some time after the commencement of the disturbance and substantially before the police vehicles left the scene to go to the Brazoria County jail, a "paddy wagon" or van-type

vehicle arrived at the scene. In addition, there were approximately 15 to 20 additional police vehicles at the scene. Despite this, Officers Jones and Saldivar, under the direct supervision of their supervisor Dugan, placed Hawkins and seven other individuals, some or all of whom had their hands handcuffed behind their backs, in the rear of the Jones-Saldivar police vehicle where they needlessly suffered intense discomfort and danger of serious physical injury.

3. At all times after Deputy Dugan arrived at the scene and assumed command of the activities at the disturbance, he became a joint tort-feasor with any officer committing a wrong of which Dugan knew, or should have known.

4. Officer Leroy Maddox knowingly participated in the wrongful activities with reference to Mary Elizabeth Dean, Mrs. Ronald Cowley and Mrs. Frank Polk because he actively participated in the arrest of Mrs. Cowley, drove the vehicle which took Mrs. Cowley, Mrs. Polk and Ms. Dean to the Brazoria County jail, and delivered them to the jail where they were subjected to the additional abuse which the jury has found to constitute cruel and unusual punishment. In this connection, Brazoria County jail at all material times, was under the command and direction of deputies of the Brazoria County Sheriff's Department who had complete control over the activities which occurred in the Brazoria County jail on the day in question. Accordingly, it has been established, as a matter of law, that Mrs. Cowley, Mrs. Polk and Ms. Dean were damaged by the combined activities of joint tort-feasors, including Officers Maddox and Saldivar, Chief Deputy Paul Dugan, and other deputies of the Brazoria County Sheriff's Department in charge of the jail.

5. Officers Roel Saldivar and Leroy Maddox participated actively in the events whereby the plaintiffs were subjected to unlawful police activity and could have easily foreseen that their unlawful activity would aggravate the disturbance on Surfside Beach and result in the deprivation of the constitutional rights of all of the plaintiffs. Saldivar and Maddox were, as a matter of law, joint tort-feasors with any other officers who at the time and on the occasion in question participated in wrongful activity with reference to the plaintiffs.

6. Sheriff Robert Gladney had no knowledge of the activities of his deputies either at the scene of the arrests or at the jail. He was apparently off duty that day and all of the activities were supervised by Deputy Dugan (now deceased). Dugan's estate was not a party to this suit at the time of trial. There is no evidence that Sheriff Gladney was negligent in the selection of his deputies. There is no evidence that Sheriff Gladney has any personal knowledge of the events at the jail on Sunday afternoon or that any of the established procedures at the jail were responsible for the treatment of the plaintiffs. There is no evidence that Sheriff Gladney personally ratified the acts of his deputies.

7. A number of officers participated in the events in question as joint tort-feasors. Defendants Maddox and Saldivar were, as a matter of law in the light of the jury verdict, joint tort-feasors whose torts proximately caused the damages to plaintiffs Polk, Cowley and Dean.

*Legal Issues Raised by Facts and Pending Motions*

The legal issues presently before the Court may be summarized as follows:

1. May liability be imposed upon defendants Brazoria County, the City of Freeport, the City of Angleton, or the City of Clute?

2. May liability be imposed upon Sheriff Gladney for the acts of his deputies?

3. Should liability be imposed upon Officer Maddox for damages attributable to Mrs. Cowley?

4. May exemplary damages be assessed against Sheriff Gladney?

5. Should the arrest records with reference to Mrs. Cowley and Mary Elizabeth Dean, both of whom have been found to have been arrested illegally, be expunged?

6. Should the Court award attorneys fees to plaintiffs' counsel?

7. May liability properly be predicated on the findings relating to cruel and unusual punishment?

*Liability of Counties and Municipalities*

■ Liability cannot be imposed upon the City of Freeport, the City of Clute, the City of Angleton, or upon Brazoria County because of the doctrine of sovereign immunity.

The foundation of the plaintiffs' claim is *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) and 42 U.S.C. § 1983. *Bivens* establishes a cause of action against an individual federal officer if the federal officer violated the plaintiff's constitutional rights and such violation is a proximate cause of damages. Review of the concurring and dissenting opinions, however, reveals that *Bivens* leaves intact the doctrine of sovereign immunity. Justice Harlan in his concurring opinion at 403 U.S. 410, 91 S.Ct. 2012 says:

. . . However desirable a direct remedy against the Government might be as a substitute for individual official liability, the sovereign still remains immune to suit . . .

Chief Justice Burger dissented, stating that the remedy against the individual officer was inadequate, and that Congress should, by legislation, establish a cause of action directly against the government. Chief Justice Burger said:

. . . In any event, an actual recovery depends on finding non-exempt assets of the police officer from which a judgment can be satisfied.

I conclude, therefore, that an entirely different remedy is necessary, but it is one that in my view is as much beyond judicial power as the step the court takes today. Congress should develop an administrative, or quasi-judicial remedy against government itself to afford compensation and restitution for persons whose Fourth Amendment rights have been violated. . . .

In *Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), a deputy sheriff in quelling a civil disturbance discharged a shotgun, injuring the plaintiff. Defendants were the deputy sheriff who discharged the shotgun, three other deputies, the sheriff himself, and the County of Alameda. Justice Marshall held that while liability could be imposed upon the sheriff, no liability could be imposed upon the county. Justice Marshall discussed in detail the legislative history relating to 42 U.S.C. § 1983, in which Congress displayed a clear intent to refrain from enacting legislation allowing the imposition of liability upon governmental entities for officer's misconduct.

The immunity of the governmental entities is also established in *Little v. Schafer*, 319 F.Supp. 190 (S.D.Tex.1970); *Burnett v. City of Houston*, 442 S.W.2d 919 (Tex.Civ. App.—Houston, 1969); *U. S. v. Faneca*, 332 F.2d 872 (5th Cir. 1964); and *Archer v. Cisco*, 211 S.W.2d 955 (Tex.Civ.App.—Eastland, 1948).

*Liability of Sheriff Gladney*

■ The shield of sovereign immunity affords no protection to Sheriff Gladney. Arguably, the law, both statutory and common law, makes Sheriff Gladney legally responsible for the acts of his deputies.

Art. 6870, Tex.Rev.Civ.Stat., states:

Sheriffs shall be responsible for the official acts of their deputies, and they shall have power to require from their deputies bond and security; and they shall have the same remedies against their deputies and sureties as any person can have against a sheriff and his sureties.

The cases construing and discussing Art. 6870 have pointed out that it merely incorporates into the Texas statutes the common law. An early case enunciating the rule which arguably governs this case as to Sheriff Gladney's liability is *Bracken v. Cato*, Tex., 54 F.2d 457, at 458, where the court said:

. . . The sheriff is the keeper of the jail of his county, and may appoint one of his deputies jailer. Article 5116. He is responsible for the official acts of his deputies. Article 6870. So far as the public is concerned, there is no difference between the official acts of the sheriff and those of his deputies. *Heye & Co. v. Moody*, 67 Tex. 615, 4 S.W. 242; *Rogers v. The Marshal*, 1 Wall. 644, 17 L.Ed. 714. See, also, note in 1 ALR 222, 236. As it was the official duty of Ramsay as deputy sheriff and jailer to keep all prisoners safely, it follows necessarily that it was a breach of that official duty and an abuse of his authority to injure or kill a prisoner without justifiable cause or legal excuse. 'The character of the act, whether official or not, does not depend upon its lawfulness, but upon the fact that the person who performs it is in fact an officer and purports to act in his official capacity and does act by virtue of authority conferred by law.' *King v. Brown*, 100 Tex. 109, 94 S.W. 328, 330. See, also, *Myers v. Colquitt* (Tex.Civ.App.) 173 S.W. 933 [993]. According to the undisputed evidence, Ramsay killed Bracken without justification or excuse. . . .

The arguable liability of Sheriff Gladney is also predicated upon *Rich v. Graybar Electric Co.*, 125 Tex. 470, 84 S.W.2d 708 (Tex.Comm.App.1935—opinion adopted), by Justice Marshall's opinion in *Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596, and particularly by the cases cited favorably by Justice Marshall in footnote 17 of the *Moor* opinion, i. e., *Lewis v. Brautigam*, 227 F.2d 124, 128 (5th Cir. 1955) and *Hesselgesser v. Reilly*, 440 F.2d 901 (9th Cir. 1971). Tex.Atty.Gen.Ops. M-990 and H-751.

In the case at bar it was established as a matter of law that the Sheriff's Department expected difficulty on Surfside Beach.

Sheriff Gladney had instructed his deputies to "meet unlawful force with lawful force." While the various deputies involved, under the findings of the jury, committed tortious acts, there is no evidence that any of them, in committing such tortious acts, turned aside from their official duties to pursue interests or activities for their own benefit. For this reason, cases such as *City of Green Cove Springs v. Donaldson*, 348 F.2d 197 (5th Cir. 1965) are not applicable.

As indicated above, it is established as a matter of law that one of Sheriff Gladney's principal and senior deputies, Deputy Sheriff Dugan arrived at the scene of the disturbance shortly after its inception, established a command post, and thereafter exercised supervisory control over all of the officers who arrived at and participated in the activities at the scene. In addition, it is established as a matter of law, that Sheriff Gladney's deputies were in charge of the jail.

Although a respectable argument may be formulated for the imposition of liability upon Sheriff Gladney, the more recent cases of the Fifth Circuit Court of Appeals and the Texas Supreme Court seem to establish the rule that a sheriff may be held liable for the brutality and mistakes of his deputies only if the sheriff knew of and participated in the torts, ratified the tortious conduct or if, as in *Whirl, infra*, the tortious conduct had persisted for such an extended period that the sheriff is, factually or legally, charged with knowledge. See *Whirl v. Kern*, 407 F.2d 781 (5th Cir. 1969); *Workman v. Freeman*, 155 Tex. 474, 289 S.W.2d 910 (Sup.Ct.1956).

*Nesmith v. Alford*, 318 F.2d 110 (5th Cir. 1963), holds that all officers who participate in an illegal arrest and detention are jointly and severally liable as joint tort feasors if they participated in any of the actions in connection with the illegal arrest and detention.

Applying the *Nesmith* case, it is apparent that Officers Maddox, Dugan and all of the Brazoria County deputies who participated in the activities at the jail and who supervised the activities at the jail were

joint tort feasors. It is established by the jury verdict and the facts found as a matter of law that certain of Sheriff Gladney's deputies were joint tort-feasors with reference to the three women plaintiffs. This case, however, provides no authority for the imposition of liability upon Sheriff Gladney.

*Liability Predicated Upon Findings of Cruel and Unusual Punishment*

It may be forcefully argued that *Ingram v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) precludes imposition of liability based upon the jury findings of cruel and unusual punishment. Justice Powell, speaking for the majority there, said:

. . . An examination of the Amendment (i. e., the Eighth Amendment) and the decisions of this Court construing the proscription against cruel and unusual punishment confirms that it was designed to protect those convicted of crimes. We adhere to this longstanding limitation . . . .

97 S.Ct. 1401, at 1409.

■ It would, however, be anomalous to hold that the State may impose summary punishment upon those merely *accused* of offenses which it could not constitutionally impose upon those *convicted* of offenses. The jury findings may be construed to support a conclusion that the deputy sheriffs here engaged in the conduct condemned not merely carelessly, but for the express purpose of punishing the plaintiffs summarily and this Court so construes the jury findings.

*Liability of Sheriff Gladney for Exemplary Damages*

■ While it is arguable that Sheriff Gladney is legally responsible for the acts of his deputies, the only Texas authority clearly reveals that he is not liable for exemplary damages. See *Taylor v. Stanford*, 229 S.W.2d 427 (Tex.Civ.App.—Galveston 1950).

*Attorneys Fees*

■ There are here no exceptional circumstances which would warrant the denial of attorneys fees in the action under 42 U.S.C. § 1988 (1976). See: Senate Report No. 94–1011, 94th Congress, 2nd Session, page 4 (June 29, 1976), U.S.Code Cong. & Admin.News 1976, p. 5908; House Report No. 94–1558, 94th Congress, 2nd Session, pages 4–6 (September 15, 1976); therefore, all this Court need do is compute a reasonable fee.

The factors pertinent to the determination of an adequate award are set forth in *Rainey v. Jackson State College*, 551 F.2d 672 (5th Cir. 1977) and are as follows:

(1) the time and labor required,

(2) the skill requisite to properly perform the legal services,

(3) preclusion of other employment by the attorney due to acceptance of the case,

(4) the novelty and difficulty of the questions presented,

(5) the customary fee,

(6) whether the fee is fixed or contingent,

(7) time limitations imposed by the client,

(8) the amount involved and the results obtained,

(9) the experience, reputation and ability of the attorneys,

(10) the undesirability of the case,

(11) the nature and length of the professional relationship with the client,

(12) awards in similar cases.

In this regard the Court has read the affidavits and briefs submitted in this cause and listened to testimony and arguments from both sides. The criteria contained in *Rainey* will be discussed in order.

(1) The time and labor required for the preparation and completion of this case have been asserted in affidavit form by attorneys W. Thomas McKissick and Edward L. Sargologos. Mr. McKissick states that he expended 27 hours in trial, two hours in post trial hearings and 255 hours in other related matters including 50 hours travel time, for a total of 284 hours. Mr. Sargologos also spent 27 hours in trial and 64 in preparing for trial. The estimated

trial time seems to the Court conservative and the estimates of preparation time reasonable.

The failure of the attorneys to keep accurate time records is a hindrance to the Court, but it has been established that the attorneys took this case on a pro bono basis before passage of the Attorneys Fees Act by Congress, thus partially explaining their failure to keep records. For the purposes of this award, Mr. McKissick will be designated as lead counsel.

Although the amounts of time may have been inflated due to duplication of effort or because of the inefficiency of these admittedly inexperienced trial counsel, the Court concludes that these figures are reasonably accurate particularly when considered in the light of the long term of pendency of this action and the voluminous filings involved. In addition, some duplication of effort and misdirected effort is normal even in cases handled by experienced counsel.

(2) This case required the skills of an average trial lawyer. There were a multitude of legal and factual issues to be sorted out and analyzed. There were a large number of witnesses to be interviewed, selected, and presented at trial. The case also needed an attorney who could present a sensitive case involving law enforcement authorities to the jurors without antagonizing them.

(3) The very relevant factor in this award of attorneys fees is the situation of Mr. McKissick and his present and possible preclusion from other employment due to his acceptance of this case. Mr. McKissick has demonstrated considerable courage by taking this case against a popular and well-known sheriff in the locale in which he is attempting to establish his practice. The potentially adverse economic impact of this case on McKissick's practice is a very real and significant factor.

(4) As evidenced by the complexities of the charge to the jury, this case contained many difficult issues. A multitude of constitutional and state law questions were presented. The questions were not particularly novel, however, and were definitely not issues of first impression requiring pioneering research or analysis.

(5) Mr. James Bradford, President of the Brazoria County Bar Association, testified on April 7, 1978, that the customary fee charged in the area where this suit was tried is $50.00 per hour for both pretrial and trial work. Plaintiffs' attorneys seek compensation of $75.00 for trial time and $50.00 for pretrial work. It is the opinion of the Court that a customary fee is difficult to ascertain in litigation of this sort but that Mr. Bradford's opinion should be given significant credibility. In *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), the Court stated that fee scales would vary but that at no time should the fee drop below the $20.00 as established by the Criminal Justice Act.

(6) As stated previously, both attorneys asserted that they took this case without expectation of remuneration. Accordingly, the factor of whether the fee is contingent or fixed is not applicable.

(7) The time limitations factor is also not applicable.

(8) The plaintiffs recovered a verdict awarding over ten thousand dollars from law enforcement authorities. In addition, important constitutional rights have been redressed. These results are significant and given considerable weight by the Court.

(9) In all candor, however, plaintiffs probably would have experienced some difficulty in retaining experienced, busy, seasoned counsel to handle this litigation. The plaintiffs' attorneys are both young and in the early stages of building their practice. Neither of them has prepared more than a small number of cases for trial prior to the instant action. The inexperience of counsel weighs heavily in this determination of fees.

(10) The fact of the undesirability of this case is apparent. It particularly affects Mr. McKissick, as already discussed in the "preclusion" section of this discussion. Often the decision to take a case of this nature is not pleasantly received by the community, and there is a high potential for public

disfavor. Therefore, this case's undesirability is an important factor.

(11) The length of the professional relationship with client is not relevant here.

(12) The awards in similar cases provide vague guidelines as to reasonableness. In *Cruz v. Beto,* 453 F.Supp. 905 (S.D.Tex. 1977), Judge Carl O. Bue awarded attorneys fees ranging from $35.00 to $90.00 per hour. The higher fees went to extremely well qualified counsel in a case which is somewhat analogous to this action. These rates are considered by this Court to be advisory only.

■ Therefore, on the basis of the affidavits of counsel, the evidence introduced on April 7, the Court's independent observations and the guidelines set forth above, the Court concludes that plaintiffs are entitled to an attorneys' fee computed as follows:

|  | McKissick | Sargologos |
|---|---|---|
| Trial and post trial time | 29 × $40 | 27 × $30 |
| Pretrial work | 205 × $25 | 52 × $20 |
| Travel | 50 × $ 5 | 12 × $ 5 |
| Total | $6,535 | $1,910 |

*Expungement of Arrest Records*

■ Plaintiffs Dean and Cowley have requested the expungement of their arrest records arising out of the incident occurring on May 11, 1975. The Court is well aware that there are only narrow instances when expungement can be regarded as a proper remedy. However, the jury specifically found that both Dean and Cowley had been arrested in retaliation for exercising their constitutional rights, that they would not have been arrested had they not exercised their constitutional rights, and that the arresting officers lacked probable cause in the arrest of Dean and Cowley. Accordingly, expungement affords appropriate relief. *Menard v. Saxbe,* 162 U.S.App.D.C. 284, 498 F.2d 1117 (1974) and *United States v. McLeod,* 385 F.2d 734 (5th Cir. 1967).

*Conclusion*

For the reasons stated above, the Court has concluded that judgment should be entered for Hawkins against Saldivar and for Sharon Polk, Mrs. Ronald Cowley and Mary Elizabeth Dean against Saldivar and Maddox in the amounts found by the jury. A judgment of even date herewith is being contemporaneously executed.