Randy Rene LOZANO, et al.,
Plaintiffs-Appellants,

v.

William French SMITH, et al.,
Defendants,

Elton Faught, et al.,
Defendants-Appellees.

No. 81–1538.

United States Court of Appeals,
Fifth Circuit.

Nov. 3, 1983.

Lopez, Medina, Ramirez, Torres & Velasquez, Isaias D. Torres, Armando Lopez, Jose A. Medina, Rebecca J. Davis, Houston, Tex., for plaintiffs-appellants.

Perry Davis, Jr., James E. Nelson, Odessa, Tex., for defendants-appellees.

Before GARZA, REAVLEY and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This is an appeal from the judgment of the district court dismissing an action brought under 42 U.S.C. § 1983 against appellees, principally Elton Faught, the former Sheriff of Ector County, Texas, Randy Tenney, one of Faught's Deputy Sheriffs, and Jackie Perkins, one of the jailers at the Ector County jail. Appellees were sued both individually and in their respective official capacities for the alleged violation of the civil rights of Larry Ortega Lozano ("Lozano"), a 27-year-old emotionally disturbed pretrial detainee being held in the Ector County jail, in Odessa, Texas. Loza-

no suffered a fatal injury in the course of being restrained and subdued there by several officers of the Sheriff's Department on the night of January 22, 1978. Appellants are the children of Lozano by his first wife. The primary questions on appeal are (1) whether the district court erred in setting aside, for lack of sufficient evidentiary support, the jury finding that the Sheriff failed to supervise the jail facilities and the personnel of his department so as to protect Lozano's constitutional rights; and (2) whether the jury findings that Deputy Tenney and Jailer Perkins used excessive force in restraining and subduing Lozano on the night of his death, but that, in doing so, they acted in good faith, are in conflict. We hold that there is insufficient evidence to support the jury finding that the Sheriff wrongfully failed to supervise his facilities and personnel. However, we further hold that the referenced jury findings respecting the liabilities of Tenney and Perkins are in irreconcilable conflict, and we therefore reverse and remand the case for a new trial as to their liability (and damages) in that regard only. In all other respects, we affirm the district court's judgment.

I.

FACTS

Though the evidence is conflicting or unclear in many of its details, the following account summarizes the principal events developed at trial. On the night of January 10, 1978, at about ten o'clock, two deputies of the Ector County Sheriff's Department, Leroy Murphy and Gene Kloss, were dispatched to the scene of a minor traffic accident in the City of Odessa, Texas, where they found a Dodge pickup which had been driven into a street-side barbed wire fence. Lozano was standing by the pickup, and he identified himself to the deputies as its driver. Lozano was asked twice by the deputies to show his driver's license, but each time he refused. The deputies then placed Lozano under arrest.[1]

---

1. Lozano was presumably arrested under Tex. Rev.Civ.Stat.Ann. art. 6701d, § 23, providing

that:

As the deputies were conducting a pat-down search of Lozano, Lozano struck Deputy Murphy on the cheek. The deputies then attempted to handcuff Lozano, and at that point, a struggle ensued. At one point during this struggle, Deputy Kloss hit Lozano "very hard" with a flashlight, causing a deep cut on Lozano's forehead. The deputies were eventually able to force Lozano to the ground, and to handcuff him with the help of a nearby resident.

After Lozano was handcuffed, Kloss radioed for help and Deputies Dee Johns and Darry Davis responded to his call. Because Johns and Davis's patrol car was equipped with a protective screen, it was decided that they would take Lozano to the county jail. Deputies Murphy and Kloss followed them.

During the ride to the jail, Murphy and Kloss's car pulled beside the other patrol car at a stop and Lozano was asked by both Murphy and Johns if he wanted to go to a hospital for treatment of his head wound, but Lozano said he did not. However, upon arrival at the Ector County courthouse, where the county jail is located on the second floor, Lozano asked Johns to take him to the hospital, and Johns told Lozano that he would be taken there after he was booked. Lozano assented, and they entered the courthouse.

The deputies took Lozano upstairs to the booking office. During the booking process, Johns asked Lozano to remove his belt.

Lozano did so, and threw it across the desk at Johns. Lozano lunged at Johns, and another struggle took place, this time with Deputies Johns and Davis. Blows were exchanged by both sides, and Lozano kicked at the deputies. The deputies were unable to subdue or control Lozano, and Davis called for assistance. Captain Bob Eaton, Patrol Sergeant Mike Harrison, and Deputy Murphy responded to Davis's call and helped subdue Lozano, who was then placed in a security or padded cell.[2]

Later, Lozano, Davis, and Johns were taken to the emergency room of the hospital, treated for cuts and bruises, and released. Lozano had cuts and scrapes on his head and facial areas, and bruises on his abdomen and legs. He was x-rayed and given medication. After being released from the hospital, Lozano was returned to the jail and placed again in a padded cell.[3]

Deputies Kloss and Murphy, the arresting officers, jointly filed a complaint charging Lozano with aggravated assault on a peace officer and with resisting arrest. Complaints charging Lozano with aggravated assault on a peace officer were also filed by Deputies Johns and Davis based on the incident at the jail. In addition, Murphy, Johns, and Davis each filed a complaint charging Lozano with criminal mischief based on the destruction of some of Murphy's and Johns's clothing by Lozano during his struggles with them.[4]

---

"No person shall willfully fail or refuse to comply with any lawful order or direction of any police officer invested by law with authority to direct, control, or regulate traffic."

2. The record shows that the jail was operated by several jailers who took turns in acting as the jailer. A jailer would work under a "shift captain." The record also shows that when there was a disturbance at the jail, deputy sheriffs would be called in to assist the jailer.

3. Deputy Jailer Gabriel Perez testified at trial that Lozano remained in one of the jail's three padded cells for two days, and was then moved into a twelve-man cell. Later, Lozano was put back into a padded cell for two more days after he acted disturbed and took a shower with his clothing on. He was then returned to a regular cell where he appears to have remained until January 22.

4. Under section 22.02 of the Texas Penal Code, an assault on a peace officer in the course of his duty, which "causes bodily injury" to the officer, is aggravated assault and a third degree felony if the offender knew or had been informed that the person assaulted was an officer. If the officer was in uniform, as these deputies were, "the actor is presumed to have known" he was a peace officer.

Resisting arrest is made an offense by section 38.03, but is a felony only if a deadly weapon is used. Since Lozano was not charged with using a deadly weapon in resisting his arrest, however, the resisting arrest offense charged was a class A misdemeanor. The evidence shows the criminal mischief charges were misdemeanors. Section 28.03(b)(3).

Shortly after Lozano's arrest, the Sheriff's Department contacted the Permian Basin Community Center for Mental Health & Mental Retardation ("MHMR"), located in Odessa, and asked them to send a counselor to talk with Lozano. On January 12, 1978, Elva Hurst of MHMR visited with Lozano at the jail. Her report of this visit was admitted into evidence and states that Lozano "was in terrible physical condition. His face was black and blue and so swollen his eyes were shut. He kept lifting his eyelids with his fingers so he could look at me." At trial, Hurst testified that when this visit occurred, Lozano's face looked like "raw hamburger." According to her report, Lozano had been hospitalized for several weeks in Austin, Texas, in August 1977, for a nervous breakdown.[5] After his dismissal, he had participated in group therapy at MHMR in Pecos, Texas.

Another MHMR worker, Arnold Salinas, visited Lozano the next day, January 13, 1978. Lozano was also seen at the jail by a psychiatrist, Dr. Charles Z.K. Mitis. Salinas, Hurst, and Natalie Rothstein, the Emergency Services Coordinator at MHMR, also visited Lozano on January 18, 1978. Meanwhile, MHMR had been seeking to make arrangements to have Lozano admitted to the state mental hospital at Big Spring, Texas, for psychiatric treatment. Rothstein testified, "I contacted the District Attorney's office ... to see if charges could be ... dropped ... so that Larry could be admitted to the state hospital because the Mental Health Code does not allow commitment to a state hospital if there are any kind of charges pending against the potential patient."[6] Rothstein further testified

---

**5.** This occurred shortly after Lozano was involved in an altercation with two officers of the Austin Police Department at a service station in Austin, where Lozano had become involved in a dispute with the station owner and was placed under arrest. Both officers testified at trial that Lozano, who weighed approximately 160 pounds, was extremely strong for his size, and that they had to rely on the assistance of the station owner and his attendant to subdue him. The officers turned into their superiors a complaint charging Lozano with simple assault and criminal mischief, but were unsure if charges were formally filed (or if filed, were dismissed) since Lozano was committed to the state hospital at Austin for psychiatric treatment.

**6.** Article 5115, Tex.Rev.Civ.Stat.Ann., provides in part:

"No person suspected of insanity, or who has been legally adjudged insane, shall be housed or held in a jail, except that such a person who demonstrates homicidal tendencies, and who must be restrained from committing acts of violence against other persons, may be held in a jail for a period of time not to exceed a total of seven (7) days. Furthermore, for such temporary holding of each person suspected of insanity, or who has been legally adjudged insane, there shall be provided a special enclosure or room ...."

In light of the other statutes cited below, it would appear that article 5115 prohibits (with the exception noted) civil insanity commitments to a jail, rather than requiring the release or transfer from jail of those held there on the basis of criminal charges but who are coincidentally insane. We have, however, been cited to no authority expressly dealing with this point.

Article 5547-31, Tex.Rev.Civ.Stat.Ann., provides:

"A sworn Application of Temporary Hospitalization of a proposed patient may be filed with the county court .... The Application may be made by any adult person ... and shall state ... that *the proposed patient is not charged with a criminal offense,* that he is mentally ill .... An Order transferring a criminal defendant against whom all charges have been dismissed to the appropriate court for a hearing on temporary commitment pursuant to Section 7 of Article 46.02, Code of Criminal Procedure, 1965, shall state that all such charges have been dismissed and the Order shall serve as the Application for Temporary Hospitalization of the proposed patient." (Emphasis added.)

Having been charged with a criminal offense, proceedings to commit Lozano would have been governed by article 46.02 of the Code of Criminal Procedure, concerning proceedings in the court where criminal charges are pending to determine the accused's competency to stand trial, and subsequent proceedings following various determinations in that regard.

Although not cited by the parties, article 5547-27, Tex.Rev.Civ.Stat.Ann., provides for an emergency admission of a mentally disturbed person into a suitable hospital or facility on the authority of a health or peace officer for a period not to exceed twenty-four hours, unless there is court authorization for further detention. It is unclear whether a person charged with a criminal offense may be subject to article 5547-27. There is also no evidence that the Sheriff's Department was aware of this

that an Assistant District Attorney informed her that his office could make no determination about the charges filed against Lozano until he was indicted.[7]

The Sheriff, Elton Faught, testified that it was the policy of his office to seek transfer of inmates with mental problems or suicidal tendencies to a mental health facility. He further testified that MHMR made his office aware that Lozano should be in a mental hospital, and that it was his understanding that "[MHMR] had conferred with the district attorney's office, the county attorney's office and were in the process of getting him committed—Of going through the court, legal court process to get him committed."[8] The Sheriff added that MHMR and his office discussed the possibility of withdrawing the complaints charging Lozano with aggravated assault.[9] Although the misdemeanor charges were dismissed before Lozano's death, the felony charges remained pending against Lozano,[10] and he therefore remained in jail.[11]

Early in the morning of Sunday, January 22, 1978, Lozano began creating a disturbance among the inmates of the southwest cell block, where he had been confined for several days. The jailer on duty, Harold

---

article or that the department was advised of it by the MHMR workers or anyone else. The record also suggests that the state hospital at Big Spring had a rule that forbade the admission of persons charged with a criminal offense.

7. Lozano had not been indicted at the time of his death. Rothstein's testimony strongly indicates that she felt that the District Attorney's office was an obstacle to having the charges against Lozano dismissed. As to the Sheriff and his deputies, however, she testified that MHMR had a "very good" relationship with them and had always received the utmost cooperation from them in connection with mental patients. On then being asked, "... [T]he problem was when you went to the District Attorney's office and you talked to the Assistant District Attorney, you were unable to get the charges dismissed and therefore he [Lozano] had to remain in jail, is that correct?", she responded, "Absolutely right."

8. Faught also stated that once MHMR was informed that his office had custody of a mentally disturbed inmate, "[t]hey took care of it from that point on."

9. While Deputy Johns testified that he had discretion "with due cause" to dismiss a charge he filed against a person, there is no evidence that Sheriff Faught could have ordered Johns, or the other deputies who filed charges against Lozano, to dismiss the charges, or that the Sheriff could have had the charges dismissed himself.

10. Plaintiffs introduced the affidavit of Virgil Lumpee, an Ector County Justice of the Peace, which states that Lozano, on January 11, 1978, pleaded guilty to the charge of driving at an unsafe speed, and was fined $50. Bail was apparently fixed on the other charges at this time. Judge Lumpee, on January 13, 1978, dismissed a charge of failure to display a valid driver's license based on a complaint filed by Deputy Kloss after Lozano showed the judge his valid Texas driver's license. The affidavit further shows that the criminal mischief charges filed by Johns, Murphy, and Davis were dismissed by them on January 20, 1978. However, no action was taken with respect to the felony complaints filed by Johns, Murphy, and Davis charging Lozano with aggravated assaults on peace officers.

11. Lozano's mother and common-law wife were, in the meantime, trying to post bond for his release. They contacted a bondswoman in Pecos, Texas, named Donna Martin, who told them that a bond for Lozano's release would cost $200. Lozano's mother testified that she could not afford to pay for the bond, though Lozano's wife testified that she had the money to pay for it. Martin, however, later informed them that she had learned from John Stringer, a bondsman in Odessa, that bond could not be made on Lozano. Stringer testified that he had been contacted by one of Lozano's sisters about making bond, and that he had talked with one of the deputies, either Kloss or Tommy McMeans, one or the other of whom, he testified, told him that Lozano had signed commitment papers, and that he could not be freed on bond. Stringer added that he never presented a proper bond on behalf of Lozano to the Sheriff's office. Kloss denied telling Stringer that no bond could be made for Lozano. McMeans did not testify. In answer to special issue number 24, the jury found that neither Kloss nor McMeans had intentionally misrepresented to Stringer that Lozano had signed commitment papers in order to deprive Lozano of his constitutional right to bail. Appellants have not attempted to set aside this finding. Issue 24 was the only issue submitted in respect to the matter of bail (except for issues which were unanswered because they were submitted conditionally on an affirmative answer to issue 24), and appellants neither requested any other issues nor made any objections to the charge.

Farnum, moved Lozano into the east green room, which was a padded cell. Later that day, Lozano began creating another disturbance, and Deputy (or Captain) George Olesh called Hurst at MHMR and told her that Lozano had "gone berserk." Hurst testified that she then contacted Dr. Mitis, who made arrangements for Lozano to be admitted to the Medical Center Hospital in Odessa. At 2:15 p.m., Lozano was taken to this hospital and placed in a security room on the fifth floor. However, the hospital refused to admit Lozano unless the Sheriff's office furnished a deputy to stand guard over him. Upon learning this, Olesh again called Hurst, and asked her if it were possible to make arrangements for Lozano to be taken to Big Spring State Hospital, since the Medical Center wanted a guard, and he could not spare a man for this job.

In her January 22, 1978 report, which plaintiffs put in evidence, Hurst states:

"I told [Olesh] that I thought it would be impossible for us to make that kind of arrangements that the best I could do was call our Emergency Services Coordinator, Natalie Rothstein and have her get in touch with him. I proceeded to give Natalie a call at her residence. She agreed to take care of calling the deputy."

Rothstein, in her report, which plaintiffs also put in evidence, states:

"I then called George Olesh who repeated that he could not spare a man to stand guard and wondered if Dr. Mitis could order medication for sedation and added that they would then place Larry in the 'green room' back at the County Jail. I called Dr. Mitis, who said he would order sedation to be given to Larry immediately before he would be transported back to the jail. He also stated that he would prescribe oral medication starting again in the morning which we could take to the jail and give to Larry twice daily. This worker then called George at the

[sheriff's office] again, related Dr. Mitis' suggestion and George stated that he would send two deputies to [Medical Center Hospital] to bring Larry back to the jail."

About 3:00 p.m., Sergeant Harrison and Deputies Ricky Kennedy and Lee Holloman drove to the hospital to pick up Lozano.[12] Harrison testified that they found Lozano barricaded in his room on the fifth floor. Lozano had shoved his bed and mattress up against the door, and would not let the nurses, or anyone else, in the room. Harrison and the deputies forced their way into the room, and Harrison began talking to Lozano. He testified that Lozano "was afraid of the air conditioning ducts, he could hear noise. He kept telling us someone was trying to get him." Harrison added that the medical staff was afraid of Lozano, but that Lozano was finally given a sedative by a nurse. Harrison further testified that Lozano was neither violent nor hostile at the hospital, but was anxious to leave.[13]

When the deputies and Lozano returned to the jail, Lozano was put back into a padded cell. Harrison testified that as they went to put him in the cell, "Larry seemed to blow up, he seemed to resist, and we just . . . talked to him for a few minutes. He finally calmed down and went on into his cell." Harrison then went back on patrol.

Later, about 7:00 p.m. that same day, Jackie Perkins, the jailer on duty that night, heard a loud banging noise coming from the west side of the jail. His report, which was introduced in evidence by plaintiffs, states:

"I arrived on the west side and noticed glass coming from the west green room where the subject, Larry Ortega Lozano, was being kept for his safety and protection. I noticed that the subject was banging his head violently against the glass 'look through hole.' Subject's head was bleeding very badly. I also noticed

---

**12.** Sergeant Harrison testified that he was in charge of Kennedy and Holloman at the hospital.

**13.** Harrison also testified that Lozano had made several previous trips to the hospital for sedatives.

that his light was still on in his cell. At this time I rushed back to the jail office and called downstairs for help to control and remove the subject before hurting himself. During this time I observed the subject and tried to talk to him and calm him down. At this time I noticed the subject pull a metal piece from the plumbing [a metal toilet ring]. I tried to talk the subject into giving the piece to me. The subject would not listen to me. I then returned to secure the jail area before help arrived. I then went back to check on Lozano and noticed he had broken his light bulb out of his cell. I then noticed that the subject still would bang on the door with the broken glass and pull the glass from the panel with his hand." [14]

Deputy Murphy, who was downstairs and acting as dispatcher that night, received Jailer Perkins's request for help and called several units for assistance. These units consisted of Deputy Skip Martin, Deputies Kennedy and Holloman, and Deputy Randy Tenney. Murphy's report, introduced in evidence by plaintiffs, states that these deputies began arriving at the jail about 7:10 p.m., and that a State Game Warden, Gary Mitchell, and an officer of the Texas Department of Public Safety ("DPS"), Roger Weaver, also responded to the call. Sheriff Faught also arrived.

The Sheriff instructed the officers to remove their weapons. The Sheriff and the officers then went up to Lozano's cell. As they approached the padded cell, the Sheriff testified that he could hear Lozano beating on the cell door, and that he could see "glass shattering, coming out of the [cell window] in the door" and falling onto the hall floor. Several deputies also testified that glass was all over the hall floor in front of Lozano's cell. The Sheriff added that he tried to talk to Lozano: "I told him who I was and that we [were] going to get help, ... and ... just take it calm and easy and let me have his weapon ...." But, according to the Sheriff, Lozano did not acknowledge his words or his presence, and Lozano kept hitting the cell door and the cell door window with the toilet ring.

Although the record is unclear, it appears that, at this point, the Sheriff went back downstairs and instructed Murphy to call a Doctor Tatum.[15] Sergeant Harrison then arrived [16] and was instructed by the Sheriff to go upstairs. Harrison testified that the Sheriff also told him that a doctor would be there presently to give Lozano a sedative. The Sheriff wanted Lozano removed from the cell so that this could be done.

According to Harrison's report, which plaintiffs also put in evidence, "When I arrived at the jail, Randy Tenney, Skip Martin, Jackie Perkins, Rick Kennedy, Dewayne Holloman, Roger Weaver and Gary Mitchell [were] in the jail area." [17] Harrison instructed these officers to remove their ties and belts.

Harrison, Tenney, and Martin then began trying to talk to Lozano, but they got no response. Several of the officers testified that Lozano kept banging the cell door with the toilet ring and some stated he was screaming, "I'm leaving this world." At this point, Harrison asked the other officers for their advice, and Tenney testified that he suggested spraying Mace into the cell to disable Lozano long enough for the officers to subdue him with as little injury as possible to all concerned. Harrison accepted

14. At trial, Perkins added that he never saw Lozano hit the cell door window with the toilet ring, the metal piece of plumbing Perkins saw Lozano with, but only with his head. This toilet ring was mounted over the "toilet" floor opening with flatheaded screws. The Sheriff testified that the ring was three fourths of an inch thick, three fourths of an inch wide, and twelve inches in diameter.

15. Murphy's testimony indicates that the Sheriff may have instructed him to call Doctor Ta-

tum just after he arrived at the jail and before he went upstairs to Lozano's cell. In any event, Murphy testified that Doctor Tatum was called at 7:25 p.m.

16. Harrison testified that he was called over the radio either by the Sheriff or the dispatcher (Murphy) to return to the jail.

17. Tenney, however, testified that Harrison was already at Lozano's cell before he arrived.

Tenney's suggestion, and Tenney then sprayed a small amount of Mace into the cell.[18] The Mace, however, failed to disable Lozano and, according to Martin, he, in fact, became more violent. The Mace caused the officers to leave the area briefly until it dispersed somewhat. Tenney, however, testified that the deputies decided to return as quickly as possible before the Mace dissipated inside the cell. According to Tenney's report, introduced by plaintiffs, several officers again tried to talk to Lozano, but he was still very hostile. The officers then attempted to trade Lozano a flashlight for the toilet ring. After several minutes, Lozano stuck the ring far enough through the feeding or "bean" hole in the cell door so that several officers were able to pull it away from his grasp.[19]

After taking the ring away from Lozano, Harrison instructed Perkins to open the cell door. The cell was dark. Kennedy testified that Lozano stepped into the light from the hall and that "[h]is face and everything had blood on it." Lozano stepped back into the darkness, and then again toward the cell door. Tenney, who was closest to the cell door, and Harrison stepped inside the cell. Harrison testified that Lozano "had ... glass in his left hand, a sliver of glass about an inch wide, maybe four or five inches long." Tenney testified that Lozano had glass in each hand. The testimony also shows that considerable broken glass was on the cell floor. Tenney's report states that, as he approached Lozano, he noticed that Lozano "appeared to have a large amount of blood on him and to be very hostile and angered." Tenney testified:

"I didn't know who [Lozano] was. I was going to try to establish communications with him, but he had his arms above his head, glass in his hands, and I hollered at one of the other officers, I said 'Who is he? Who is he?' I just wanted to address him mostly, I was fixing to ask

'What is wrong? You don't have to do this ....' And I never had a chance."

Tenney added that he felt "fear for my life" because of the way Lozano held the glass and the way he was looking at him. Tenney and Lozano lunged at each other, and Tenney threw a headlock around Lozano's neck. Tenney testified that he applied as much pressure as he could while he had Lozano in the headlock. Perkins and several of the other officers quickly rushed in and forced Lozano to the floor, thus breaking Tenney's headlock. Although it is unclear, the testimony of Tenney and Perkins suggests that Tenney may have applied a second headlock to Lozano to hold him on the floor. Lozano grabbed Tenney by the genitals and began biting Tenney's stomach. Perkins testified that he grabbed Lozano under the chin and pulled him off of Tenney. Lozano was then rolled over on his stomach, his hands were pinned behind his back, and he was handcuffed. Harrison testified that he instructed the officers to place a security belt on Lozano. After this was done, the officers picked Lozano up and took him just outside of the cell and laid him on the floor near the cell door. At this point, Tenney left the cell area and did not return.

Lozano continued to struggle, and the security belt was tightened. At that point, the Sheriff returned upstairs. Harrison noticed that Lozano was lying on broken glass, and Lozano was moved farther down the hall out of the area of the broken glass, where it was intended for Lozano to remain until the doctor arrived. Martin testified that Lozano kept beating his head on the floor and kicking, and that to prevent this, two officers, one of whom was Perkins, held down his legs and two other officers held down his shoulders. The Sheriff and Martin then went downstairs to get some leather leggings to place on Lozano's ankles to keep him from kicking.

**18.** Sergeant Harrison testified that he was not present when the Mace was sprayed into the cell. There is no testimony by Harrison, however, regarding whether or not he gave Tenney permission to spray the Mace into the cell.

**19.** Deputies Martin and Kennedy testified that the toilet ring was taken away from Lozano before the Mace was sprayed into the cell.

About this time, Reserve Deputy Philip Neundorff a pharmacist with first aid experience, arrived. In his report, introduced by plaintiffs, Neundorff stated that he "noticed a change in color of [Lozano's] hands and arms and knew he was relaxing, so restraint was no longer necessary.[20] I [then] checked his breathing and heart beat [sic]. There was none. Then the deputies rolled him over and I gave him a heart massage. I worked at this for about six minutes and turned it over to another deputy and [a state DPS officer] for about one minute, then I tried it again, but to no avail." An ambulance, which had been called, arrived, and one of the attendants also gave Lozano heart massage, but he was unsuccessful in his efforts to revive Lozano. Doctor Tatum arrived about 8:00 p.m. and pronounced Lozano dead. An inquest was subsequently held, which found that Lozano's death had been accidental.[21]

All the deputies who testified, and their reports which were prepared pursuant to the Sheriff's instruction the night of Lozano's death and admitted into evidence, were unanimous in their assertion that, other than the headlock thrown around Lozano's neck by Deputy Tenney, no one hit, kicked, or sat on Lozano during the incident. At trial, however, appellees' medical expert, Doctor Joseph Jachimczyk, Chief Medical Examiner for Harris County, testified that according to the autopsy reports Lozano had 115 separate injuries to his body. Doctor Jachimczyk testified that these injuries were not "self-inflicted," but that "the vast majority" of them "could" have been "accidentally inflicted." Appellants' medical expert, Dr. Reuben Santos, also a medical examiner, testified that "some" but not all of the injuries could have been self-inflicted, and that it was "very difficult" to tell whether "they were all accidental or intentional." Both Doctor Santos and Doctor Jachimczyk testified, in effect, that Lozano died as a result of a traumatic injury to the neck, which caused asphyxia, and that the fatal neck injury could have been produced by a headlock thrown around Lozano's neck.

## II.

### PROCEEDINGS BELOW

Appellants Randy Rene Lozano and Lawrence Dereck Lozano, by and through their mother, Rufina Alvarez Lozano, as next friend, filed suit on January 22, 1980, in the federal district court for the District of Columbia seeking damages and declaratory relief "to redress the deprivation under color of statute, ordinance, regulation, custom or usage of a right, privilege or immunity secured to [appellants] and their deceased father by the Fourth, Fifth, Eighth, and Fourteenth Amendments and the provisions of 42 U.S.C. §§ 1981, 1983, 1986, and 1988." The complaint also stated that "[t]he pendant jurisdiction of this Court is invoked to consider Plaintiffs' claims arising out of" Article I, sections 9, 13, and 19 of the Texas Constitution, articles 1.09, 15.16, 15.17, 16.-21, 17.01 et seq., and 43.24 of the Texas Code of Criminal Procedure, and articles 5115, 5116, and 6866 of the Revised Civil Statutes of the State of Texas.

The suit was filed against a host of federal, state, and Ector County officials, many of whom were dismissed before trial, and who are not parties to this appeal.[22] On

---

**20.** Harrison testified that he had Deputy Kennedy loosen the handcuffs on Lozano.

**21.** Judge Lumpee presided at the inquest hearing. He testified, without objection, that a jury returned a verdict of "accidental death" after hearing the evidence presented. This inquest was conducted by the local District Attorney. An Assistant Texas Attorney General was present.

**22.** When the case went to trial, the following defendants were still in the lawsuit: the County Commissioners Court of Ector County,

County Commissioners Childers, Johnson, Pressly, and Guerrero, County Judge Watkins, Sheriff Faught, Sergeant Harrison, Deputies Murphy, Johns, Davis, Kloss, Martin, Tenney, Kennedy, and Holloman, and Jailers Perkins and Farnum. The record shows that appellants sued St. Paul Insurance Company as the surety for Sheriff Faught and his deputies, but that St. Paul's motion for summary judgment was granted on the ground that St. Paul was not the surety for those defendants. This ruling was not appealed. It does not appear that the Sheriff's surety, the identity of which is not shown

September 10, 1980, the district court transferred the case to the Western District of

by the record, was ever made a defendant. The Permian Basin MHMR and its director were also made defendants, but were subsequently dismissed voluntarily by appellants.

The federal defendants were the Attorney General of the United States, the United States Department of Justice, and the Deputy Attorney General for the Civil Rights Division of the United States Department of Justice. The complaint alleged that they conspired to obstruct a federal grand jury's investigation into Lozano's death because of his Latin ancestry. On April 1, 1981, the district court dismissed the claims against these defendants, holding that suit against them in their official capacities was barred by sovereign immunity and that appellants failed to state a claim against them individually. Appellants dismissed an earlier appeal from this ruling.

The state defendants were DPS Officer Weaver and Game Warden Mitchell, who assisted the deputies in subduing Lozano on the night of his death. They were dismissed before trial because limitations had run on appellants' claim against them. This ruling was not appealed.

After the appellants rested their case at trial, the district court granted an instructed verdict in favor of the four County Commissioners and the County Judge, in their individual capacities, and for Jailer Farnum, apparently in both his individual and official capacities. No appeal has been taken from these rulings.

**23.** Appellants' complaint specified six numbered causes of action. Their fourth cause of action, the only one remaining material on this appeal, complained of the events on the evening of January 22, and alleged that a few hours after Lozano was returned to the jail from the hospital he was beaten and abused by Perkins, Tenney, Harrison, Kennedy, Murphy, Martin, Holloman, Mitchell, Weaver, Farnum, and Newman, acting under color of law, in a manner that caused his death, that "far exceeded that which would have been reasonable to restrain the deceased in his padded cell," and that constituted cruel and unusual punishment, depriving him of his rights, under the Fourteenth Amendment, and through it, under the Fourth Amendment, to be secure in his person, under the Fifth Amendment, not to be deprived of life without due process of law, and under the Eighth Amendment, to be free of cruel and unusual punishment. They also alleged that "defendants' actions and/or failure to act further violated" sections 9 (search and seizure), 13 (denial of bail and cruel and unusual punishment), and 19 (due process) of Article I of the Texas Constitution, articles 1.09 (excessive bail and cruel and unusual punishments), 16.21 (sheriff to keep safely, without cruel means,

Texas. There, the case proceeded to a week-long jury trial,[23] after which the jury,

persons in his custody), and 43.24 (forbidding ill-treatment of prisoners awaiting execution) of the Texas Code of Criminal Procedure, and articles 6866 (sheriff's bond), 5115 (jail standards), and 5116 (sheriff to supervise and control jail and safely keep prisoners there) of the Texas Revised Civil Statutes Annotated. It was also alleged that the Sheriff, the Commissioners, and Perkins, the jailer, were liable for having denied Lozano "because of his Latin ancestry" the same rights "as those afforded to white citizens ... in violation of 42 U.S.C. Sec. 1981 by failing to provide a safe and suitable jail, resulting in loss of life to the deceased ...." However, no issue or instruction was submitted to the jury as to any equal protection discrimination against Lozano (racial, ancestral, cultural, or otherwise) by anyone at any time.

Appellants' first cause of action complained of the actions of deputies-defendants Murphy, Kloss, Johns, and Davis in beating Lozano during his arrest on January 10 and later "that same night," using "force in excess of that necessary to effectuate an arrest." It was alleged that these defendants, acting under color of law, subjected Lozano "to the deprivation of his rights, privileges and immunities secured by the Fourteenth Amendment of the U.S. Constitution, Article I, Sections 9 and 13 of the Texas State Constitution and Articles 1.09 and 43.24 of the Texas Code of Criminal Procedure in contravention of 42 U.S.C. Section 1983 ...." The jury found against appellants on the only issues submitted respecting this cause of action, and no complaint is made of these findings on appeal. This cause of action, and also the second and third, additionally contained allegations that the complained of actions were taken "because of deceased's Latin ancestry" in violation of 42 U.S.C. § 1981, but, as noted, no such theory was submitted to the jury as to any of the causes of action. The second cause of action complained of the Sheriff's "refusing to accept bail for the deceased, in a bailable case, in violation of Texas State Constitution Article [ ] I ... [section] 13, the Texas Code of Criminal Procedure Articles 15.16 [taking arrestee before a magistrate], 15.17 [duties of magistrate, including admitting arrestee to bail] and 17.01 et. seq. [bail]." The only issue submitted to the jury in reference to this cause of action was answered favorably to the defendants (*see* note 11, *supra*), and this cause of action is not pursued on appeal. The third cause of action complained of the failure "to transfer the deceased to a mental institution or hospital ... in violation of Article 5115," Tex. Rev.Civ.Stat.Ann. (*see* note 6, *supra*), and asserted that the County Judge and the County Commissioners were liable in this connection

in response to special issues, submitted under Fed.R.Civ.P. 49(a), found: that Deputies Murphy and Kloss did not use excessive force in arresting Lozano on January 10, 1978; that Deputies Johns and Davis did not use excessive force in booking Lozano on the night of the arrest; that Deputy Tenney and Jailer Perkins used excessive force in restraining and subduing Lozano in the Ector County jail, but that Deputies Kennedy, Martin, and Holloman, and Sergeant Harrison did not; that the use of excessive force by Tenney and Perkins was the proximate cause of Lozano's injuries and death, but that they were performing their duties in good faith on that occasion; and that neither Harrison, Kennedy, Martin, Holloman, Tenney, nor Perkins subjected Lozano to cruel and unusual punishment or failed to provide him with a safe environment while incarcerated in the county jail. The jury found that the "Commissioners Court" and the Sheriff each "failed to supervise their facilities and personnel so as to insure [*sic*] the recognition of" Lozano's "civil rights; specifically, Lozano's right to be free from the use of excessive force during an arrest and while in custody; Lozano's right to be free from cruel and unusual punishment; and Lozano's right to be provided a safe environment while incarcerated." [24] The jury also found that their

failure to supervise caused the injuries to and/or the death of Lozano. However, the jury further found that the "Commissioners Court" and Sheriff Faught were performing their duties in good faith at the time of Lozano's injuries. Appellants made no objections to the jury charge or issues submitted.

After trial, appellants moved to set aside the jury findings that Tenney and Perkins, and the Sheriff and the Commissioners Court, acted in good faith. Appellants also asked the court to set aside the failure of the jury to award any damages for the violation of Lozano's civil rights. Appellees filed a motion for judgment based on the findings of the jury; but in the alternative, they moved the district court to disregard the jury finding that the Commissioners Court and the Sheriff had failed to supervise their personnel and facilities.

■ Upon consideration of these motions, the district court held that the jury finding that Deputy Tenney and Jailer Perkins acted in good faith was supported by "the great weight and preponderance of the evidence." The court, however, set aside the jury finding of good faith on the part of the Commissioners Court and the Sheriff, holding that under *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63

for "failure to provide defendant [Sheriff] Faught with a manual of procedures for such transfer," but that "[i]f such manual was in fact provided, defendant Faught violated Article 5115 . . . by willfully and maliciously failing to and/or causing others to fail to comply with the procedures." Liability was asserted under the Fourteenth Amendment and 42 U.S.C. § 1983. These allegations were not submitted to the jury and have not been pursued. The fifth cause of action alleged that the acts complained of in the previously alleged causes of action brought about Lozano's death and were "in violation of the deceased's civil rights, as provided by the United States and Texas Constitutions and the statutes of the United States and Texas; and the cause of action which the deceased Larry Ortega Lozano may have had for the violation of his civil rights and his untimely death accrues to the plaintiffs herein for which they bring this claim." It also alleged that defendants' acts and omissions were willful or grossly negligent, and asked for actu-

al and exemplary damages. The sixth and final cause of action was only against the federal defendants, was dismissed before trial (*see* note 22, *supra*), and is not here pursued.

24. In respect to the supervision question, the district court instructed the jury:

"If you find that officers used excessive force against Lozano and caused his death, then you may consider the liability of the Commissioners' Court of Ector County and the Sheriff who are charged by law with the duty of seeing that the facilities and personnel under their control are run in compliance with constitutional standards. . . . The test you may use in determining whether the supervisory officials violated Lozano's rights is whether they knew or should have known that Lozano's civil rights were being violated, and whether they did exercise control or failed to exercise control when they should have exercised control to prevent Lozano's injuries and death."

L.Ed.2d 673 (1980), they were not entitled to assert the good faith defense.[25] But the court further held that there was no evidence to support the jury findings that the Commissioners Court and the Sheriff had failed to supervise their facilities and personnel, and that in any event, this failure was not a constitutional deprivation since there was no showing that such failure was a custom, policy, or practice enforced by them. The district court, therefore, rendered a take-nothing judgment against appellants.

25. In *Owen,* the Supreme Court held that cities sued under section 1983 are not entitled to a qualified good faith immunity based on the good faith of its officials. However, the officials still retain their qualified good faith immunity in their individual capacities.

26. On appeal, appellants apparently do not attack the district court's judgment for the "Commissioners Court" (which consists of the four County Commissioners, each elected from a distinct area or precinct, and the County Judge, elected by the entire County). We note that there was no evidence that any of the Commissioners or the County Judge, or persons hired by them, were personally involved in the Lozano affair, nor was there proof of a decision, custom, or policy sanctioning, or of the occurrence of other incidents involving, the use of excessive force by the Sheriff's Department against individuals arrested and/or confined in the county jail. The County has no liability under the Texas Tort Claims Act, Tex. Rev.Civ.Stat.Ann. art. 6252–19. Section 14(9) of the Act expressly exempts "[a]ny claims based on `. . . or arising out of the failure to provide, or the method of providing, police or fire protection." *See Davis v. County of Lubbock,* 486 S.W.2d 109, 110 (Tex.Civ.App.— Amarillo 1972, no writ). *See also County of Brazoria v. Radtke,* 566 S.W.2d 326, 330 (Tex. Civ.App.—Beaumont 1978, writ ref'd n.r.e.) (county is not liable under state law for failure to train and supervise deputy sheriff) (dictum). Section 14(10) exempts "[a]ny claim arising out of assault, battery, false imprisonment, or any other intentional tort." Counties are expressly exempted from liability under the Texas Wrongful Death Act, article 4671, Tex.Rev.Civ. Stat.Ann., although under section 3 of the Texas Tort Claims Act counties may be liable for "property damages, personal injuries or death" resulting from the operation or use of a motor vehicle or the condition or use of tangible real or personal property, subject, however, to the exceptions (*see* sections 14(9) and 14(10),

## III.

## THE SHERIFF

Appellants contend that the district court erred in holding that there was no evidence to support the jury finding that the Sheriff had failed to supervise his facilities and personnel.[26] Appellants argue that, on the night of Lozano's death, Sheriff Faught had notice of Lozano's mental condition and of "a potentially explosive situation," but yet the Sheriff failed personally to supervise and to direct his officers in their handling of the situation, specifically the removal of

above-noted) provided in the Act. The Texas decisions also indicate that the Commissioners Court was not responsible for the supervision of the jail respecting its actual operation, its employees, and the safekeeping of prisoners. *See Wichita County v. Vance,* 217 S.W.2d 702, 704 (Tex.Civ.App.—Fort Worth 1949, writ ref'd n.r.e.). *See also* Op.Atty.Gen.1978, No. H–1190 (authority to supervise, direct, or control the actual daily operation of a county jail is vested in the sheriff, although the commissioners court does have general responsibilities in connection with the operation of the jail). *See also Torres v. Aransas County Navigation District No. 1,* 346 S.W.2d 903, 904 (Tex.Civ.App.—San Antonio 1961, no writ) (commissioners of county navigation district could be sued individually, but not in their official capacities); *Jones v. Texas Gulf Sulphur,* 397 S.W.2d 304, 308–09 (Tex.Civ.App.—Houston 1965, writ ref'd n.r.e.).

And, as observed in note 22, *supra,* appellants have not appealed from the instructed verdict for the Commissioners and the County Judge individually. Of course, no issues were submitted to the jury, nor were there any instructions, respecting any of the Commissioners or the County Judge individually.

We also note that appellants did not attack in the district court, nor on appeal, the jury findings that exonerated Murphy, Kloss, Johns, Davis, Kennedy, Martin, Holloman, and Harrison for the parts they played in the various incidents involving Lozano. Nor have appellants attacked the jury findings that the officers, including Tenney and Perkins, did not subject Lozano to cruel and unusual punishment or deprive him of a safe environment while incarcerated in the county jail. Because of this, we consider that appellants' claims on appeal regarding the Sheriff necessarily depend on there being sufficient evidence that he failed to supervise his facilities and personnel so as to protect Lozano's right to be free from the use of excessive force.

Lozano from his padded cell. They further argue that the Sheriff's failure to supervise was also manifested from "the absence of any training, instruction, or guidance for individual officers concerning critical departmental policies," primarily the use of force in restraining a prisoner. Upon review of the record, however, we must agree with the district court that there is no legally sufficient evidence that the Sheriff wrongfully failed to supervise his facilities and personnel.

■ To be liable under section 1983, a sheriff must be either personally involved in the acts causing the deprivation of a person's constitutional rights, or there must be a causal connection between an act of the sheriff and the constitutional violation sought to be redressed. *Douthit v. Jones,* 641 F.2d 345, 346 (5th Cir.1981). A causal connection may be established, for section 1983 purposes, where the constitutional deprivation and practices occur as a result of the implementation of the sheriff's affirmative wrongful policies by his subordinates, *Wanger v. Bonner,* 621 F.2d 675, 679 (5th Cir.1980), or where the sheriff wrongfully breaches an affirmative duty specially imposed upon him by state law, and as a result thereof, the complained of constitutional tort occurs. *Barksdale v. King,* 699 F.2d 744, 746 (5th Cir.1983). *Douthit,* 641 F.2d at 346; *Sims v. Adams,* 537 F.2d 829, 831 (5th Cir.1976).

Article 5116, Tex.Rev.Civ.Stat.Ann., imposes on a Texas sheriff the duty of supervising his county's jail:

"(a) Each sheriff is the keeper of the jail of his county. He shall safely keep therein all prisoners committed thereto by lawful authority, subject to the order of the proper court, and shall be responsible for the safe keeping of such prisoners.

"(b) The sheriff may appoint a jailer to take charge of the jail, and supply the wants of those therein confined; but in all cases the sheriff shall exercise a supervision and.control over the jail."

*See also* Tex.Code Crim.Proc. art. 16.21.[27]

■ Thus, a Texas sheriff can be held liable under section 1983 if his own sufficiently wrongful failure to supervise the jail causes constitutional injury.[28] However, the Sheriff may not be held liable under section 1983 on the basis of *vicarious* liability for the acts or omissions of his deputies. *Baskin v. Parker,* 602 F.2d 1205, 1208 (5th Cir.1979); *Dean v. Gladney,* 621 F.2d 1331, 1334 & n. 7 (5th Cir.1980), *cert. denied,* 450 U.S. 983, 101 S.Ct. 1521, 67 L.Ed.2d 819 (1981); *Watson v. Interstate Fire & Cas. Co.,* 611 F.2d 120, 123 (5th Cir.1980); *Reimer v. Smith,* 663 F.2d 1316, 1323 (5th Cir.1981).

Here, it is undisputed that the Sheriff did not personally participate in the alleged beatings administered to Lozano, though Lozano was restrained, subdued, and re-

**27.** Article 16.21 provides:

"Every sheriff shall keep safely a person committed to his custody. He shall use no cruel or unusual means to secure this end, but shall adopt all necessary measures to prevent the escape of a prisoner. He may summon a guard of sufficient number, in case it becomes necessary to prevent an escape from jail, or the rescue of a prisoner."

**28.** In *Familias Unidas v. Briscoe,* 619 F.2d 391 (5th Cir.1980), this Court noted that because of "the unique structure of county government in Texas ... the sheriff ... holds virtually absolute sway over the particular tasks or areas of responsibility entrusted to him by state statute and is accountable to no one other than the voters for his conduct therein." 619 F.2d at 404. The Court also noted that where a county official "is the final authority or ultimate repos-

itory of county power, his official conduct and decisions must necessarily be considered those of one 'whose edicts or acts may fairly be said to represent official policy' for which the county may be held responsible under section 1983.-" *Id.* While it is thus arguable that the alleged tortious failure of Sheriff Faught to supervise his jail facilities and personnel would constitute a constitutional wrong on the part of the County itself, because we find insufficient evidence of such tortious failure, we do not reach this question nor all the Eleventh Amendment issues which an affirmative answer to it would present. *See Briscoe,* 619 F.2d at 404 col. 2; *Crane v. State of Texas,* 534 F.Supp. 1237, 1243–45 (N.D.Tex.1982); *Van Ooteghem v. Gray,* 654 F.2d 304, 306 (5th Cir.1981) (en banc), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1255, 71 L.Ed.2d 447 (1982); *Doe v. Sullivan,* 472 F.Supp. 975, 976–78 (W.D.Tex.1979).

moved from his cell pursuant to the Sheriff's command. Nor was the Sheriff present when the beatings were alleged to have occurred. At trial, appellants sought, instead, to establish a causal connection between the Sheriff and Lozano's constitutional injuries by proving that the Sheriff had failed to supervise his facilities and personnel, and, to some extent, that he had failed to train his deputies in the use of physical force to restrain a prisoner. We note at the outset, however, that the jury was not charged on the failure to train theory. Furthermore, appellants did not request an issue or instruction regarding training (nor does the complaint contain any allegations concerning failure to train). We therefore do not consider appellants' arguments thereon as a basis for reversal.[29]

Regarding the Sheriff's alleged failure to supervise, we note that there is no contention that this asserted failure was intentional or knowingly committed with the purpose of injuring Lozano, or that it was the result of an affirmative practice, custom, or policy instituted by the Sheriff. Appellants do argue that the Sheriff's failure to supervise was grossly negligent, or a manifesta-tion of his deliberate indifference. There is, however, no evidence in the record which would sustain findings that the Sheriff was grossly negligent or deliberately indifferent regarding the discharge of his supervisory duties, nor were any such findings made.[30]

This leaves the question of whether there is sufficient evidence that, on this single occasion, the Sheriff wrongfully failed to discharge his supervisory duties over the jail and his officers.[31] However, our review of the record, taken in the light most favorable to appellants as required by *Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir. 1969), has failed to disclose sufficient evidence of culpable negligence on the Sheriff's part.

The evidence shows that on the night of Sunday, January 22, 1978, Sheriff Faught arrived at the jail sometime after seven o'clock, after being notified by telephone that his officers were having a problem with an inmate. When the Sheriff arrived at the jail, he instructed those officers who were already present to remove their weapons. The Sheriff and the officers then proceeded upstairs to Lozano's padded cell. The Sheriff attempted to talk to Lozano,

**29.** In holding that there was no evidence that the Sheriff and the Commissioners Court failed to supervise their facilities and personnel, the district court emphasized appellants' failure to request that the jury be instructed as to the duty of the Sheriff and the Commissioners Court to train the deputies on how to avoid using excessive force.

**30.** The special issue inquiring whether the failure to supervise "was intentional and malicious" was not answered since it was submitted conditionally on a finding against the Sheriff or the Commissioners Court on the issue as to their good faith.

**31.** We note that several of our decisions indicate that isolated, nonsystemic simple negligence on the part of a supervisory official does not establish a claim under section 1983. *See Bowen v. Watkins,* 669 F.2d 979 at 988 (5th Cir.1982) ("usually, a failure to supervise gives rise to section 1983 liability only in those situations in which there is a history of widespread abuse"); *Reimer v. Smith,* 663 F.2d at 1323 (allegation of negligent failure to supervise does not state section 1983 claim); *Wanger v. Bonner,* 621 F.2d at 680 (sheriff's "failure to adopt policies to prevent constitutional viola-tions ... would not be an adequate basis for liability under § 1983"); *Vela v. White,* 703 F.2d 147, 153 (5th Cir.1983); *Watson v. Interstate Fire & Cas. Co.,* 611 F.2d at 123. Indeed, we have held, where a jail prisoner being subdued died as a result of the defendant police officer's application of a choke hold, that there was no section 1983 liability since the evidence showed that the officer was guilty of no more than "negligent performance of lawful custodial functions" which "did not constitute 'the sort of abuse of government power' that is cognizable under § 1983." *Williams v. Kelley,* 624 F.2d 695, 698 (5th Cir.1980), *cert. denied,* 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 391 (1981). Because we hold there was insufficient evidence of the Sheriff's culpable negligence, we need not determine what effect the Supreme Court's opinion in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), has on these decisions. We observe, however, that subsequent to *Parratt,* the Court in *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981), cited *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), with apparent approval, for the proposition that a "general allegation of administrative negligence fails to state a constitutional claim cognizable under § 1983."

but he got no response. Deputy Martin testified that when he arrived at Lozano's cell the Sheriff was in command, and that the Sheriff told the officers that a doctor was coming to give Lozano a sedative and that "we were to get him out and try to put the strait jacket [*sic*] on him so the doctor could go ahead and sedate him." The testimony indicates that the Sheriff, at that point, returned downstairs and instructed Murphy, who was acting as dispatcher, to call for a doctor to come to the jail. At the time the Sheriff left the cell area, no one had touched Lozano, nor is there any evidence that the officers who remained upstairs took any action with respect to Lozano before Sergeant Harrison arrived.[32]

Although Sheriff Faught testified that he remained in charge throughout the whole affair, the testimony shows that he, in effect, by leaving the area, turned over command of the immediate situation in the cell area to Sergeant Harrison, who had just arrived, and who, after Sheriff Faught, was the highest ranking member of the Sheriff's Department present. Harrison testified that the Sheriff "instructed me to go upstairs, that they were having trouble with Larry Lozano, that he was in touch with the doctor. The doctor would be there presently to give him a sedative. He wanted us to take [Lozano] out of the cell."

Once Harrison went to Lozano's cell, the evidence shows that he, in fact, took charge. Tenney testified that Harrison was in command. Harrison testified: "I arrived upstairs, the other officers were present. A few still had ties and belts on. I told them to remove them . . . ." Harrison also testified that he was the ranking officer up-

stairs, and that he directed strategy, once the toilet ring had been taken away from Lozano. Harrison instructed Jailer Perkins to open the cell door, and Harrison and Deputy Tenney were the first officers to step inside. Harrison testified that his intent was to subdue Lozano and take him out of the cell.[33] Once Lozano had been subdued, handcuffed, and placed in a security belt, pursuant to Harrison's instructions, Lozano was removed from the cell to a spot just outside the cell door.

At this point, the evidence shows that Sheriff Faught came upstairs "to see if [the officers] had done what I had instructed them to do." Harrison noticed that Lozano was lying in the broken glass, and the officers moved him farther down the hall. The Sheriff then returned downstairs with Martin to get some leather leggings to put on Lozano's ankles to prevent him from kicking. When Lozano's hands began to turn white, Harrison instructed Deputy Kennedy to loosen the handcuffs. When Lozano's breathing became shallow, Harrison had the officers roll Lozano on his back, and Reserve Deputy Neundorff began administering CPR. Meanwhile, an ambulance had been called.

This evidence, taken in the light most favorable to appellants, does not support their contention that "Sheriff Faught's absence from the immediate cell area [resulted in] a dangerous lack of direction and extreme confusion by the officers involved."[34] The evidence shows, instead, that the Sheriff gave his officers instructions that Lozano was to be subdued, handcuffed, put into a security belt, and re-

---

32. Harrison testified that Mace was sprayed into the cell while he was not present, but this is not necessarily inconsistent with Tenney's testimony, which is relied on by appellants, that Harrison approved Tenney's advice to spray Mace into the cell. In any event, there is no evidence that the Mace, even if sprayed into the cell while no one upstairs was in charge, was a cause of Lozano's death.

33. Perkins also testified that "[o]ur intent was to go in there to control [Lozano]. The first thing we had to do, and to get medical help for him."

34. Appellants, relying on the testimony of Martin, assert that "total chaos" reigned inside the cell for "several minutes." This testimony, however, must be viewed in the context of the situation the officers faced. Lozano was violent, and the cell was dark. The officers were confronted with a volatile situation. Harrison's testimony, which is relied on by appellants and is supported by the testimony of Perkins and Kennedy, shows that the "chaos" lasted only about thirty to sixty seconds.

moved from his cell so that the doctor could give him a sedative, and that Sergeant Harrison, the ranking officer, took command and implemented these instructions.

Appellants assert that the evidence shows that Harrison was uncertain about how to handle the situation. In particular, they rely on the testimony of Tenney, who said that he thought it was unusual that Harrison would ask for his advice since he (Tenney) had only been with the Sheriff's Department one month when this incident occurred. However, Tenney further testified that when other officers were present they would normally confer among themselves so as to decide on the best course of action to pursue. Tenney added that Harrison was in command in the absence of the Sheriff.

We cannot say that the mere fact that Harrison asked his subordinate officers for advice shows that there was an absence of command and guidance, or that Harrison was unfit to implement the Sheriff's instructions. There is no indication in the trial testimony that Harrison's prior experience demonstrated, or tended to show, his inability to handle the situation which developed at Lozano's cell.[35]

As to the other officers who were present that night, there is no evidence that any one of them was incapable of carrying out the Sheriff's instructions in the Sheriff's absence. There is no evidence that Harrison or the other officers ever asked that the Sheriff be present, or that they sought additional instruction or information from

him, or that the Sheriff ever refused any such requests for assistance or advice. There is no evidence that a headlock, such as applied to Lozano's neck by Deputy Tenney, or of any other kind, was customarily applied by any of the jailers or deputies or had previously caused any injuries or death to persons arrested by any of the deputies or confined in the Ector County jail. There is no evidence that the fatal injury, which according to the medical testimony was probably inflicted on Lozano by Tenney, occurred while no one was in charge. There is no evidence of any custom or practice of beating inmates, or of similar violations by the officers of the Sheriff's Department, or that the Sheriff knew or should have known of such misconduct and failed to take action to prevent it. There is no evidence that any of the officers involved in the events of January 22 had violent or vicious tendencies, which had, or should have, become known to the Sheriff before the incident in question. There is no evidence that the Sheriff failed to exercise care in the hiring of his officers. There is no evidence that the Sheriff instructed his officers to use unlawful force against Lozano or any other inmate. And there is no evidence that the Sheriff tolerated the use of excessive force in his Department.[36]

Appellants cite several instances which they claim show that a lack of direction and supervision prevailed within the Sheriff's Department, particularly on the night of Lozano's death.[37] However, these instances

35. In fact, earlier that day at the hospital, Harrison had successfully calmed Lozano without any violence. Harrison had been with the Sheriff's Department for three years, and he had about nine years of law enforcement experience at the time of Lozano's death.

36. The Sheriff testified that his written policy was "[t]hat no officer at any time was ever to use any more force than was necessary to execute an arrest."

37. Appellants' first set of arguments center on the actions of the officers on the night of Lozano's death.

First, appellants argue that Tenney should not have sprayed Mace into Lozano's cell, since it made him more violent. Tenney testified that he sought and obtained Harrison's permis-

sion to use Mace so that Lozano could be disabled and subdued with as little injury as possible to everyone concerned. There is no evidence that the Mace was used with the intent to make Lozano more violent or for any other improper purpose. There is no evidence that Mace had the tendency to make persons more violent, or that its use was inappropriate in these circumstances, much less that this was, or should have been, known to the Sheriff or the deputies.

Second, appellants assert that there was no discussion of sweeping away the glass which lay on the floor outside the cell door. However, the officers were faced with more pressing matters. Their attention was focused on the need to restrain Lozano and remove him from the cell, where broken glass was also scattered about the floor.

at most show negligence on the part of Harrison and the other officers in the actual implementation of the Sheriff's instructions, for which the Sheriff is not liable in a section 1983 action. *Baskin v. Parker, supra.* While there is some confusion and conflict in the testimony as to several of the details of what transpired on the evening of January 22, particularly in the cell area, nevertheless there is simply insufficient evidence on which to base an affirmative finding that the Sheriff was culpably negligent in failing to realize that his personal presence at the cell would be required in order to prevent excessive force from being used against Lozano.

■ In view of the above, we hold that the district court correctly ruled that there is insufficient evidence to support the jury finding that the Sheriff improperly failed to supervise his personnel and facilities. That the Sheriff did not personally direct the efforts of his officers to subdue Lozano under the circumstances did not amount to a wrongful failure to supervise, especially

Third, appellants assert that Harrison's failure to instruct the officers to stay out of Lozano's cell also showed a lack of direction and supervision. However, on previous occasions, it had taken more than two officers to restrain and subdue Lozano. Although the evidence is unclear as to how many officers actually entered the cell and aided in subduing him, the evidence relied on by appellants tends to show that the assistance of several officers enabled them to subdue Lozano more quickly than would have otherwise been the case if only two or three officers had attempted the task.

Fourth, appellants argue that the officers should not have opened the cell door and tried to talk to Lozano, since previous attempts to do so had failed. However, Lozano had manifested to Sergeant Harrison sharp swings in his mood and behavior. Harrison had calmed Lozano twice before by talking to him. The officers made repeated attempts to calm Lozano by talking to him and getting him voluntarily to come out of the cell.

Fifth, appellants say that the events which took place inside the cell during the restraining and removal of Lozano showed a total lack of direction. In the same connection, appellants argue that the officers were uncertain as to who was in charge. However, the evidence shows that other officers recognized Harrison as the ranking officer and followed his instructions, and Harrison directed the officers to handcuff Lozano, place him in a security belt, and remove him from the cell.

Of more significance respecting the three contentions just above-referenced, the events to which they are directed took place out of the presence of the Sheriff and there is nothing to suggest that he should have anticipated the asserted derelictions on Harrison's part, or on the part of others, which the matters cited by appellants are claimed to reflect.

Sixth, appellants argue that the failure of the officers to move Lozano to another padded cell also shows a lack of supervision and direction. This argument overlooks the fact that Lozano was handcuffed and in a security belt. Although he was banging his head on the hall floor, there is no evidence that the cell floor of the other padded cell was any different from the one from which he had just been removed, which was concrete. Moreover, Lozano was moved farther down the hall out of the glass to await the doctor.

Appellants also assert that certain instances, that happened before the night of Lozano's death, show a lack of supervision by the Sheriff.

First, they argue that there was no policy regarding the treatment of an injured prisoner, relying on the testimony of Deputy Murphy that he was unaware if there was a policy in the Sheriff's Department to ask an injured prisoner if he wished to go to a hospital for treatment. Murphy, however, also added that he normally asked such a question, and did, in fact, ask Lozano if he wanted to go to the hospital to receive treatment of the cut he received on his forehead during his arrest.

Second, appellants argue that the failure to follow up on a report prepared by Deputy Glenn Tilley and filed a few days after Lozano's arrest, which appellants claim shows that Lozano had suicidal tendencies, shows a lack of supervision. This report states:

"On January 11, 1978, as I was processing Larry Lozano, he kept talking about how he wanted to hurry up and die so he could come back to this world in a different way. He also talked about how his life was nothing but trouble. He stated that a person should take better care of himself and not get messed up like he did. He also stated that he believed in reincarnation and was ready to try it."

The evidence clearly shows that the Sheriff's Department was aware of Lozano's mental problems and that it had contacted MHMR, whose counselors were admitted into the jail to see Lozano. When Lozano became disturbed, he was placed in a padded cell.

Third, appellants claim that there was a lack of supervision at the hospital on the afternoon of January 22. However, the evidence plainly shows that Harrison was in charge of the deputies who accompanied him to the hospital, and that Harrison successfully calmed Lozano and brought him back to the jail without incident.

in the absence of any evidence that Harrison, the ranking officer, or any of the other officers concerned, were incapable of handling the situation without the Sheriff's active in-person supervision and direction.

Because there is insufficient evidence that the Sheriff was guilty of a wrongful failure to supervise his facilities and personnel, he is not liable, individually or officially, for Lozano's death under section 1983.[38]

**38.** We do not decide whether the Sheriff individually would be liable under a state law cause of action, as opposed to a section 1983 action, on a pure vicarious liability or *respondeat superior* basis, for the wrongful acts of his deputies, pursuant to the provisions of article 6870, Tex.Civ.Stat.Ann., that "sheriffs shall be responsible for the official acts of their deputies . . . ."

We think it plain that such a state law cause of action was not presented below, and it has not been urged on appeal. While the complaint relied on and cited many Texas statutes and provisions of the Texas Constitution, it appears that these were invoked to establish the defendants' responsibility for the claimed invasions of Lozano's constitutional rights for purposes of liability under section 1983, *see Douthit v. Jones,* 641 F.2d at 345; *Barksdale v. King,* 699 F.2d at 746, or in support of the section 1981 allegations that Lozano was denied his state law rights because of his Latin ancestry. Neither the complaint nor appellants' proposed pretrial order (no pretrial order was signed by the court) cites article 6870 or asserts that the Sheriff has vicarious or *respondeat superior* liability for the acts of his deputies, apart from some fault or breach of duty on his own part. Appellants' proposed pretrial order states the only issues of law, apart from limitations, are "whether Lozano suffered any deprivation of his constitutional rights" and "whether Defendants are entitled to immunity." Nothing in the court's jury instructions suggests vicarious liability was in issue. Nor do any of the post-trial motions.

Our understanding in this regard is reinforced by the nature of the only two causes of action available under Texas law for personal injuries resulting in death. One is under the Survival Statute, article 5525, Tex.Rev.Civ.Stat. Ann., and the other is under the Wrongful Death Act, articles 4671–4678, Tex.Rev.Civ. Stat.Ann. None of these statutes were cited or named in the complaint. Nor were the complaint's party allegations made to conform to either statute. The complaint merely alleged that the plaintiffs "are children, issue of Decedent" and that their mother brought the suit as next friend. The evidence showed the plaintiffs' mother was divorced from Lozano, who at the time of the events in suit apparently had a common-law marriage to another woman who was then expecting his child, and that Lozano's mother was living. Under the Survival Statute, if the suit is not brought by the executor or administrator of the deceased's estate, it is normally required that the plaintiffs allege there is no administration pending and no necessity for

same and that they are the only heirs (or devisees) of the deceased. *Sustaita v. Valle,* 38 S.W.2d 638, 640–41 (Tex.Civ.App.—San Antonio 1931, no writ); *Martinez v. Angerstein,* 517 S.W.2d 811, 816 (Tex.Civ.App.—Corpus Christi 1974, writ dism'd). Under the Wrongful Death Act, the suit must be brought by or expressly for the benefit of all the statutory beneficiaries listed in article 4675, including any surviving parent of the deceased. *See Webb v. Huffman,* 320 S.W.2d 893, 899–900 (Tex.Civ.App.—Amarillo 1959, writ ref'd n.r.e.). Moreover, the various actual damages issues as submitted asked "what amount of money do you find would reasonably compensate Lozano for this violation of Lozano's civil rights" or "would reasonably compensate Lozano if he were living," and the jury was instructed to consider "Lozano's physical pain and suffering; Lozano's mental pain and anguish; Lozano's projected future earnings. . . . Your verdict must be *solely* to compensate *Lozano* for the deprivation of *his* civil rights." (Emphasis added.) This reflects a submission under section 1983, not under a state law cause of action. While the deceased's pain, suffering, and anguish are recoverable under the Survival Statute, his post-death projected earnings are not, for recovery is limited to damages suffered up until the time of death. Under the Wrongful Death Act, predeath damages, such as the deceased's pain and suffering, are not recoverable, and the post-death recoverable economic damages are not the deceased's projected earnings as such, but rather what he would have contributed to the beneficiaries had he lived, that is to say, *their* respective losses, not *his. See* 17 Tex.Jur.2d *Death By Wrongful Act* §§ 47 (at 596), 114, 115; *Landers v. B.F. Goodrich Co.,* 369 S.W.2d 33 (Tex.1963); *Allen v. Riedel,* 425 S.W.2d 665, 670–74 (Tex.Civ.App.—Eastland 1968, no writ); *Martinez v. Angerstein,* 517 S.W.2d at 815–17; *Sustaita v. Valle supra.* We advert to these well recognized principles of Texas law not to suggest that they present any reversible error, *see Schafer v. Stevens,* 352 S.W.2d 471, 473–74 (Tex.Civ.App.—Dallas 1961, no writ), but rather because, taken together, they clearly demonstrate that the case below was not presented or tried as a state law cause of action. This is also evidenced by the charge conference, where the court, upon sustaining an objection by appellees to portions of the proposed charge referring to rights grounded in state law, stated to counsel for appellants, "Any objection to that, Mr. Lopez? We are going under 1983, just take

## IV.

### THE OFFICERS

■ Appellants' next contention is that the district court erred in holding that there was sufficient evidence that Deputy Tenney and Jailer Perkins were performing their duties in good faith at the time of Lozano's injuries. Although we agree with the district court that there was sufficient evidence to support the finding of good faith, the instructions to the jury disclose that this finding is in irreconcilable conflict with the jury's earlier finding that Tenney and Perkins used excessive force in restraining and subduing Lozano. The judgment in their favor must therefore be reversed and remanded for a new trial on these issues.

In its charge to the jury, the district court stated:

"Excessive force is the use of force greater than is reasonably necessary in order to accomplish some lawful purpose such as the arrest or confinement or restraint of a prisoner. *To find that excessive force was used you must also find that the [defendants] involved in the separate incident knew that the force they were using was excessive.* The burden of proof is on the Plaintiffs to prove that the Defendants used an excessive force on Lozano and knew that they were using excessive force." (Emphasis added.)

The district court then charged the jury as follows on the good faith defense:

"Defendants aren't liable for damages if you find that they injured or caused the death of Lozano while performing their duties in good faith. This is called the *good faith* defense. It means that they acted as ordinary and reasonable peace officers would act under the circumstances, and it *means that they reasonably believed* in all good faith *that their acts* were constitutionally permissible and *were necessary to the performance of their job duties.* The supervisory officials are also entitled to the good faith defense if you find that they faithfully executed their duties of overseeing the officers and managing the jail facilities in good faith and good conscience.

"*No Defendant is entitled to the good faith defense if he knew or reasonably should have known that the actions he took would violate the constitutional rights of Lozano,* or if he acted with malicious intention to harm Lozano." (Emphasis added.)

Based on these instructions, the jury, in effect, found that Tenney and Perkins, in using excessive force, "knew that the force they were using was excessive." Under the instructions, this precluded a finding of good faith. These two findings cannot be reconciled and hence cannot stand.

out 'grounded in state law'," to which appellants' counsel replied, "Yes, Your Honor. I don't see any problem with that."

Finally, we note that it is open to considerable doubt whether article 6870, Tex.Rev.Civ. Stat.Ann., imposes a true vicarious or *respondeat superior* liability on a Texas sheriff. Older decisions by this Court and the Texas courts indicate that it does. *See, e.g., King v. Brown,* 100 Tex. 109, 94 S.W. 328 (1906); *Bracken v. Cato,* 54 F.2d 457 (5th Cir.1932). More recent opinions, however, indicate that "a sheriff or constable is not liable for the unauthorized acts of his deputies where the liability arises in tort unless the sheriff or constable authorizes, participates in, or ratifies the individual tortious acts of his deputies." *Rhoden v. Booth,* 344 S.W.2d 481, 488 (Tex.Civ.App.—Dallas 1961, writ ref'd n.r.e.). *See Miller v. Jones,* 534 F.2d 1178, 1180 (5th Cir.1976) ("In order for the Sheriff to be liable under Texas law, he must

know or have reason to believe that injury will likely be inflicted or he must have reason to anticipate the danger thereof and thereafter be negligent in failing to take steps to prevent the injury."); *Workman v. Freeman,* 155 Tex. 474, 289 S.W.2d 910 (1955); *Taylor v. Stanford,* 229 S.W.2d 427, 429 (Tex.Civ.App.—Galveston 1950, no writ). The authorities are reviewed in some detail in *Williams v. Thomas,* 511 F.Supp. 535, 539–41 (N.D.Tex.1981), in which the conclusion is reached that "absent some direction or ratification by the sheriff" his liability may be established only by showing some "sort of administrative or participatory negligence" on his part in a case of this kind. *Id.* at 539. For a slightly earlier review, with similar conclusions, *see Dean v. Gladney,* 451 F.Supp. 1313, 1321 (S.D.Tex.1978), *aff'd in part and rev'd in part on other grounds,* 621 F.2d 1331 (5th Cir. 1980), *cert. denied,* 450 U.S. 983, 101 S.Ct. 1521, 67 L.Ed.2d 819 (1981).

## V.

### CONCLUSION

Since the case must be reversed and remanded for a new trial as to Deputy Tenney and Jailer Perkins, we do not reach appellants' remaining contentions of error.[39] Accordingly, we affirm the district court's judgment in favor of Sheriff Faught, and reverse and remand for a new trial the judgment in favor of Tenney and Perkins.[40]

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

**39.** The other contentions of error concern (1) the admission into evidence of a filmed experiment conducted by appellees which showed that a man of Lozano's size could break the cell door window of the padded cell with the toilet ring which Lozano used on the night of his death, and (2) alleged prejudicial remarks made during the closing argument of appellees' attorney. We observe respecting the first ground that the complained of evidence was in direct rebuttal to appellants' evidence on the same subject, that appellants' complaints go more to the weight than to the admissibility of the evidence and relate to matters within the district court's discretion, that the evidence was merely corroborative of the unobjected to testimony of the officer who broke the window, and that the district court's instructions to the jury, when the evidence was admitted, highlighted, in a manner favorable to appellants, the principal grounds on which appellants had objected, told the jury that it could consider these matters in determining what weight the evidence deserved, and, in effect invited the jury to pay it little attention. The jury was not allowed to take the film to the jury room, and appellants were afforded the opportunity to show their film to the jury a second time. We find no error in the district court's handling of this matter. As to the second ground, the principal complaint is the reference to the results of the inquest into the cause of Lozano's death. This subject was opened up by appellants, who called the inquest officer and made reference to the inquest over which he presided. Appellees' counsel on cross-examination asked the result of the inquest. There was no objection to any of this evidence. While appellants contend that the district court had instructed appellees not to go into this, we find no such instruction in the record; the reference given by appellants is merely a ruling excluding from evidence a particular deposition taken during the inquest which appellants were trying to introduce. The district court instructed the jury, "You must consider what you have heard in this court room, and in this court room alone. You are not to consider any other case, legal proceeding or legal action." The court also instructed the jury to remember, in reference to the lawyers' arguments, that they were partisans, while the jurors were supposed to be judges, that the jury was to decide the case solely on the basis of the court's instructions and the evidence, and, on numerous occasions, that what the lawyers said was not evidence. Finally, this matter is relevant only to the events of the evening of January 22, and we believe that the jury verdict, distinguishing as it did between the officers involved, sufficiently indicates the absence of material prejudice, certainly any such that would not be removed by retrial as to Tenney and Perkins.

**40.** Because appellants have not challenged the jury findings that Tenney and Perkins did not subject Lozano to cruel and unusual punishment and/or fail to provide him with a safe environment while incarcerated in the Ector County jail, the issues on retrial should be confined to (1) whether Tenney and Perkins used excessive force in restraining and subduing Lozano on the night of January 22, 1978; (2) whether such use of excessive force, if any, was the proximate cause of Lozano's death and/or of any of his injuries; (3) whether Tenney and Perkins knew that the force they were using was excessive; (4) whether they acted maliciously in such use of excessive force; and (5) damages (actual and, if appropriate, exemplary) in respect thereto. (Interrogatories 14 and 15, respectively, inquiring as to malice in connection with and damages from Tenney's and Perkins' use of excessive force in restraining and subduing Lozano, were each unanswered because each was submitted conditionally on a "no" answer to interrogatory 13, which inquired whether they acted in good faith and which the jury answered "yes.") Our listing of items (1) through (5) above is intended to indicate the substantive claims left open on remand, not the wording of the interrogatories or method of submission of the case in any retrial, which we, of course, leave to the district court in the first instance.

**GARZA, Circuit Judge, concurring in part and dissenting in part.**

I concur in that part of the opinion of the majority that the jury findings in respect to officers Tenney and Perkins are in irreconcilable conflict and that the case as to them must be reversed and remanded for a new trial. However, I must respectfully dissent from the affirmance of the action taken by the court below that there was insufficient evidence to support the jury findings that the Sheriff wrongfully failed to supervise his facilities and personnel.

I will not repeat the bizarre facts of this case for they are fully set out in the majority opinion. I differ with the majority in the effect of the evidence that was before the jury and the inferences that the jury could have drawn from the same.

Texas law is clear that a Sheriff is fully responsible for the care of those placed in his custody.

From the facts as we know them, Lozano's condition was such that he should not have been kept in a Texas county jail but in a mental institution. Two things kept Lozano from being transferred to a mental institution; (1) was the pending charges of aggravated assault on a peace officer brought by the Sheriff's own deputies. The evidence tends to show that it was the district attorney who refused to dismiss the felony charges and he unfortunately was not a party to this lawsuit. There is no evidence that the Sheriff himself intervened in any way to see that these charges were dismissed as to Lozano. Everyone should have realized that because of his condition, Lozano could never be convicted of the felony charges against him, and (2) the evidence shows that the MHMR facility in Odessa was willing to keep Lozano in their facility but they wanted a guard with him at all times and the Sheriff's office made the decision that they could not spare the personnel for this purpose. I am sure that the Sheriff was made aware of this. If his budget was such that he could not hire people to guard Lozano at the MHMR facility, he could have easily approached the county commissioner's court for an amendment to his budget, but there is no evidence that he even attempted to do so. I agree with the appellants that the Sheriff's failure to supervise those under his care in this case was gross negligence and a manifestation of his deliberate indifference. While there was no actual finding by the jury in this regard, such a finding is implicit in the finding that it made and the same should not have been set aside by the court below.

The trouble with the majority opinion is that it focuses on what happened on the fatal night of January 22 and the actions of the Sheriff himself on that occasion. I firmly believe that what happened on January 22 would never have happened if the Sheriff had taken the necessary steps to have Lozano put in a mental institution where he could have been kept under medication to avoid the necessity of having to subdue him because of his condition. This is why I would not have set aside the finding against the Sheriff. The finding of the jury of no damages is clearly erroneous. A violation of a constitutional right always causes at least nominal damages which also entail the granting of costs and attorneys fees.

I would therefore reverse as the majority the case against officers Tenney and Perkins both on the issue of liability and damages. I would reverse the court below and let the jury verdict against the Sheriff stand and remand it as to him on the issue of damages.